Filed 5/15/14  In re Miguel A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MIGUEL A. et al., Persons Coming Under the Juvenile Court Law. | D064941 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J514-548ABC) |
| v. | |
| S.L. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed in part; reversed in part; and remanded with directions.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant R.O.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant S.L.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minors.

S.L. challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings regarding her three children under Welfare and Institutions Code section 300, subdivision (b),[1] and its removal of those children from her custody under section 361. R.O., the children's father, contends the court erred by declining to award custody to him under section 361.2 without first determining it would be detrimental to do so. We conclude below that substantial evidence supports the juvenile court's jurisdictional findings and removal of the children from S.L. However, we also conclude the juvenile court erred in failing to consider whether awarding custody of the children to R.O. would be detrimental to them, as was required by section 361.2. We reverse the orders in that respect and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

S.L. suffers from bipolar disorder and has an extensive criminal history that began when she was arrested on drug charges at age 18. In 2002 she gave birth to Miguel while serving a 10-and-a-half-month sentence for violating parole. The San Diego County Health and Human Services Agency (Agency) commenced dependency proceedings concerning Miguel due to S.L.'s incarceration and inability to arrange for Miguel's care. The court declared Miguel a dependent and placed him in foster care.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

While incarcerated, S.L. underwent drug treatment and other reunification services, including further substance abuse treatment, therapy, and anger management. Once paroled, S.L. and R.O. moved into a sober-living apartment and married, and S.L. gave birth to Ricardo in 2003. Although S.L. struggled with her reunification plan requirements, she made sufficient progress that the juvenile court returned Miguel to her care in January 2004 and terminated jurisdiction in August 2004. Raquel was born in 2006.

R.O. was in and out of federal custody between 2008 and 2010; when he was not incarcerated, R.O. lived with S.L. and the children.

*The Initial Petition in This Case*

R.O. was arrested in March 2012 and charged with robbery, obstructing a police officer, and solicitation to commit murder. Thereafter, S.L. stopped taking the medication for her mental health issues and fell back into drug use, which " 'intensified' " and " 'aggravated' " her behaviors. In March 2013, the children were living with their paternal grandmother, H.S., who enrolled them in school. However, within a few months, they moved to Riverside with S.L. to the home of their maternal grandfather, Raymond L.

In May 2013, Riverside County's child welfare services agency (Riverside) received a report that S.L. was behaving erratically, including having verbal arguments with Raymond and causing property damage to his home, and that the children had not attended school "in a while." Riverside received a second report four days later indicating that police were called several times due to S.L. causing property damage, S.L.

3

was verbally abusive to the children and threw a broom at Miguel, Raymond was in the process of evicting S.L., and the children had been away from school for the past 30 days.

In June 2013, Riverside received two additional reports. The first indicated that drug paraphernalia was found in the bathroom S.L. and her children had used at Raymond's house, and although police were notified, they were unable to locate S.L. The second indicated S.L. had left residential drug treatment at Kiva and that S.L. was observed screaming and swearing at the children. She also was stopped from squeezing Miguel's face so hard he cried intensely, but said " '[W]ell, if he doesn't shut the fuck up I'm really going to hurt him.' " Although the children begged to stay at Kiva, and Kiva staff encouraged her to stay, S.L. took the children and left.

Thereafter, S.L. rebuffed Riverside's attempts to help her and Riverside eventually closed its referrals due to S.L.'s lack of cooperation and its inability to locate the children. At some point, S.L. returned to San Diego with the children and began living illegally in an apartment that had no electricity or running water.

In July, the Agency received a report that S.L. had been verbally and physically abusive to her children (kicking and slapping them and pulling their hair), and that she had failed to provide them with food. By the time of the report, the property manager for the apartment complex had succeeded, with police assistance, in evicting S.L., and the Agency was unable to contact her despite multiple attempts.

In August and September 2013, S.L. showed up at Polinsky Children's Center (PCC) wanting to drop off her children. The Agency created a safety plan under which the children were released to H.S., but nine days later H.S. informed the Agency she

4

could no longer care for the children because she did not want to deal with S.L.'s threats or the children's behaviors. S.L. initially told the Agency to put the children in foster care, but eventually picked the children up from H.S.

S.L. informed the Agency she was receiving services through Parentcare drug treatment center and the Agency needed to leave her alone, but she was later arrested on a felony warrant for robbery and hit-and-run accident with property damage. At the time of the arrest, S.L. and her children were living in a vehicle. The arresting officer observed that the vehicle and the children were dirty and unkempt and that S.L. exhibited signs of being under the influence of a controlled substance. One of the officers took the children, who were crying and hungry, to PCC.

A social worker interviewed S.L. at Las Colinas Detention Facility. S.L. claimed she had no idea why she had been arrested and explained that she was participating in substance abuse treatment because she would " 'do anything and say anything' " to get the resources she needed, not because she had a substance abuse problem. S.L. refused to sign releases of information or consent for treatment for the children and asked that they be placed with H.S.

A social worker interviewed the children at PCC. They did not disclose any abuse or neglect and did not know much about alcohol or drugs. The children had little memory of attending school other than when they were living with H.S. and said S.L. bought them food with food stamps when they were hungry.

H.S. told the social worker that S.L. had consistently failed to provide the children with food or a home and had essentially been living in their vehicle since Raymond asked

5

S.L. to leave his home; she also indicated that their clothes were always dirty and that Raquel had had lice for some time. H.S. believed S.L. was using drugs due to her keeping odd hours, the way she smelled after returning home, her considerable weight loss in a short period of time, and her rapid spending of the $1,300 she received each month, none of which went for food or housing. According to H.S., S.L. had taught the children to steal from stores by hiding items in their pants and the children were very protective of S.L. and would never say anything negative about her.

Social workers also interviewed two of S.L.'s sisters, T.M. and R.R.. T.M. stated S.L. did not have a stable home and needed medical help because she was bipolar but did not take her medication. T.M. also reported S.L. and R.O. had engaged in domestic violence in front of the children. R.R. expressed concern for the children's well-being due to S.L.'s homelessness, unemployment, verbal abuse of the children, drug abuse, and mental health issues. Both sisters indicated a willingness to care for the children only if S.L. would give up her parental rights.

In October 2013, the Agency filed petitions on behalf of the children under section 300, subdivision (g), alleging that S.L. and R.O. were incarcerated and unable to arrange appropriate care for the children. At the detention hearing, the juvenile court detained the children in out-of-home care and authorized supervised visits with both parents, but ordered that S.L.'s visits also be closely monitored to minimize the possibility that she would try to influence the children's potential testimony in her criminal case. The children's counsel asked the court to amend the petitions and make a prima facie finding that the children were in need of protection based on S.L.'s substantial neglect of them

6

(§ 300, subd. (b)), as well as both parents' incarceration (§ 300, subd. (g)). The court did not grant the request, but set the matter for a jurisdiction and dispositional hearing and warned that "everyone is on notice that both the Agency and minor[s'] counsel are looking into the possibile [section 300, subdivision (b)] allegations."

### Initial Jurisdiction/Disposition

As of the time of the jurisdiction/disposition report, Miguel and Raquel were detained in separate foster homes and Ricardo was detained at PCC. R.O. had pled guilty to robbery (with a dismissal of the solicitation to commit murder charge) and was likely to be in prison for a little over three years.

R.O. requested that his children be placed together and with H.S.

### The Amended Petitions and Detention

In October 2013, the Agency filed amended petitions adding counts under section 300, subdivision (b) based on the police report regarding S.L.'s robbery and hit-and-run charges. The report stated that on August 5, 2013, S.L stole a phone from a mobile phone store, hit and scratched the store manager who had pursued her, and struck and damaged a parked car while fleeing in her vehicle, all in the presence of her children.

At the detention hearing on the amended petitions, the court found a prima facie showing under section 300, subdivisions (b) and (g).

### Jurisdiction/Disposition

As of the time of the jurisdiction and dispositional hearing, all three children were placed in separate foster homes, although Miguel's foster mother had just requested his placement elsewhere because of untreated mental health issues and discipline problems at

7

school. The court received the Agency's reports in evidence and heard arguments of counsel. S.L. presented no affirmative evidence. The court dismissed the section 300, subdivision (g) counts and found the counts filed under section 300, subdivision (b) true by clear and convincing evidence. The court declared the children dependents of the court and removed them from parental care under section 361, subdivision (c)(1). Over the Agency's objection, the court placed Miguel and Ricardo with H.S. and Raquel with a paternal aunt. The court ordered unification services be provided.

Each parent timely appealed.

## DISCUSSION

### I.

### *S.L.'S APPEAL*

S.L. contends insufficient evidence supports the juvenile court's jurisdictional findings and dispositional orders removing custody of the children from her. We disagree in both respects.

A.    *Applicable Legal Principles*

At the jurisdictional hearing, the juvenile court determines whether the child is described by one or more subdivisions of section 300. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.) Under section 300, subdivision (b), the Agency must show by a preponderance of the evidence that the parent's neglectful conduct has caused the child to suffer serious physical harm or illness, or creates a substantial risk that the child will suffer such harm or illness. (§§ 300, subd. (b), 355, subd. (a).)

8

Under section 361, subdivision (c)(1), custody of a dependent child may not be removed from his or her parents unless the court finds there is clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child. (*Ibid.*; *In re J.K.*, *supra*, 174 Cal.App.4th at p. 1433.)

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.*, *supra*, 174 Cal.App.4th at p. 1433.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

B.    *Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings*

Substantial evidence demonstrates S.L.'s erratic behavior and instability put her children at risk. S.L. had a history of drug abuse and drug charges — including a previous dependency case involving Miguel — and credible evidence suggested she likely had relapsed. For example, Raymond found paraphernalia and possible drugs in the bathroom S.L. and her children used; H.S. observed behaviors suggesting S.L. was using drugs; a Riverside social worker who spoke with S.L. on the phone suspected she

9

was under the influence; and the officer who arrested S.L. stated she was exhibiting behaviors indicating she was under the influence.

S.L.'s own statements also suggest she had relapsed. Although S.L. told one social worker that "she ha[d] been clean and sober from alcohol, meth and pot for 6 years," a few weeks later she admitted to a different social worker that she had used marijuana and consumed alcohol much more recently. S.L. also told her arresting police officer that she drank alcohol. S.L.'s statement that alcohol and amphetamine were her drugs of choice, and her half-hearted participation in substance abuse treatment, also suggest she was using drugs and alcohol again.

Substantial evidence also showed S.L.'s untreated mental health problems were contributing to her instability. S.L.'s sister reported S.L. was bipolar and needed treatment. And Raymond reported S.L. was stable when on medication, but went off medication after R.O. was incarcerated in 2012.

S.L. was also verbally and physically abusive to the children. She had been seen yelling profanities at her children, squeezing Miguel's face and throwing a broom at him, kicking and slapping the children, and pulling their hair.

S.L.'s instability resulted in exceedingly poor parental decisionmaking that put the children at risk. She and the children lived illegally in an unsanitary apartment that had no running water or electricity. S.L. taught her children to shoplift and had her children with her when she stole the cell phone, which resulted in a physical altercation in close proximity to the children and a hit-and-run accident with the children in the vehicle. When S.L. was arrested, police observed the children appeared unkempt, were wearing

dirty clothes, had stained teeth, and were hungry.[2] And S.L. left paraphernalia, and possibly drugs, accessible to the children at Raymond's house.

Finally, S.L.'s two attempts to leave her children at PCC, her request that the children be placed in foster care, and her request that a sister care for the children for a few months were illustrative of S.L.'s inability to supervise the children.

This extensive pattern of S.L.'s conduct distinguishes her case from *In re J.N.* (2010) 181 Cal.App.4th 1010, 1022-1023, which involved only a single drunk driving incident that the appellate court deemed insufficient to justify jurisdiction. Similarly, S.L.'s criminal activity in her children's presence, apparent drug abuse, and physical and verbal abuse of the children demonstrate a risk of serious physical harm or illness to the children that was lacking in *In re Janet T.* (2001) 93 Cal.App.4th 377, 390, which focused on the children's absence from school and the mother's untreated mental health issues. Finally, while we agree with S.L. that "homelessness and poverty are not grounds for jurisdiction," the circumstances of this case show that homelessness and poverty were not the basis for the juvenile court's jurisdictional findings.

S.L. argues her children provided statements substantiating that she adequately cared for them. But under a substantial evidence review, we determine whether the evidence supports the juvenile court's findings, not whether other evidence would support

---

[2]     We note it is not the fact of S.L.'s arrest, but the circumstances that led to it, that support the court's jurisdictional finding. (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077 ["There is no 'Go to jail, lose your child' rule in California."].)

a different finding. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.) Here, there is ample evidence to support the jurisdictional findings.

C.      *Substantial Evidence Supports the Juvenile Court's Dispositional Orders*

The same substantial evidence that supported the court's jurisdictional findings also supported the court's dispositional orders. The conditions that supported jurisdiction remained unabated (apart from S.L.'s incarceration). And because the court made its jurisdictional findings under the heightened clear and convincing evidence standard, those findings meet the higher evidentiary burden required of dispositional orders removing custody.

Citing *In re S.D.*, *supra*, 99 Cal.App.4th at page 1079, S.L. suggests that the court erred by removing custody from her because she was amenable to having the children remain with R.O.'s relatives. However, S.L.'s reliance is misplaced because that case involved jurisdictional findings rather than dispositional orders. Further, while it is true that a court cannot assume jurisdiction over a child under section 300, subdivision (g) in cases where the incarcerated parent has made arrangements for the child's care, "the same is not true of a parent whose acts or omissions have led to jurisdictional findings under section 300, subdivision (b)." (*In re A.A.* (2012) 203 Cal.App.4th 597, 607; *In re T.V.*, *supra*, 217 Cal.App.4th at p. 137.) Accordingly, we see no error in the court's dispositional orders removing custody from S.L.

12

## II.

## *R.O.'S APPEAL*

R.O. contends the court erred by removing custody from him — a noncustodial parent — without first making a finding of detriment as required by section 361.2. We agree.

A.  *Applicable Legal Principles*

When a juvenile court orders removal of a child from a custodial parent under section 361, the court must then determine if there is a noncustodial parent who desires custody.  (§ 361.2, subd. (a).)  "If that parent requests custody, the court *shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a), italics added.)  The court must specify its basis for finding detriment either in writing or on the record.  (§ 361.2, subd. (c); *In re Isayah C.* (2004) 118 Cal.App.4th 684, 701.)  "An incarcerated parent has the same right as other parents to be given the opportunity to request custody under section 361.2."  (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 606.)

B.  *Analysis*

The Agency concedes the "juvenile court erred in not considering [R.O.] as a noncustodial father under [section 361.2] and by failing to make a finding it would be detrimental to constructively place the children in his care."  Indeed, the record is devoid of the express findings required by section 361.2, subdivision (c).  The Agency suggests this court can remedy the deficiency by making an implied finding of detriment.

13

However, "[i]mplying a finding of detriment under section 361.2 . . . presupposes the court considered the correct code provision." (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1824.) Because that did not occur here, we reverse the jurisdictional and dispositional orders in this regard and remand the matter for the juvenile court to conduct the analysis required by section 361.2.

## DISPOSITION

The jurisdictional and dispositional orders are reversed to the extent the juvenile court failed to consider placement of the children with R.O. as a noncustodial parent. We remand with directions to that court to conduct the analysis required by section 361.2. In all other respects, the orders are affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P.J.

HALLER, J.

14