Filed 4/6/15  In re N.K. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re N.K. et al., Persons Coming Under the Juvenile Court Law. | B256353 (Los Angeles County Super. Ct. No. DK02127) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> C.K., <br><br> Defendant and Appellant. | MODIFICATION OF OPINION AND ORDER DENYING PETITION FOR REHEARING <br><br> CHANGE IN JUDGMENT |

THE COURT:[*]

The opinion filed March 16, 2015, in the above-entitled matter is modified in the following manner:

The text under the section entitled "DISPOSITION" on page 15 is deleted and replaced with the following text:

> The jurisdictional, dispositional, and all subsequent orders are reversed.  The matter is remanded with directions to the juvenile court to vacate all orders and dismiss the petition upon issuance of the remittitur. The dismissal of counts b-7 and b-8 is affirmed.

This modification changes the judgment.

Appellant's petition for rehearing is denied.

Filed 3/16/15  In re N.K. CA2/8 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re N.K. et al., Persons Coming Under the Juvenile Court Law. | B256353 (Los Angeles County Super. Ct. No. DK02127) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> C.K., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steven Klaif, Juvenile Court Referee.  Affirmed in part; reversed in part.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Appellant.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

C.K. (mother) appeals the juvenile court's jurisdictional and dispositional orders regarding her two teenage sons, 16-year-old N.K. and 12-year-old D.K. Jurisdiction was based on a single sustained allegation mother endangered the children after a maternal aunt was arrested for selling narcotics out of a motor home on the same property where mother and the children lived. We reverse the jurisdictional and dispositional orders because insufficient evidence supported a current or future risk of harm to the children, given maternal aunt and the motor home were no longer on the property and there was no evidence to suggest maternal aunt would return.

The Los Angeles County Department of Children and Family Services (DCFS) cross-appeals the juvenile court's dismissal of allegations that J.K.'s (father's) substance abuse history and related criminal record and prior instances of domestic violence with mother endangered the children. We affirm dismissal of these allegations because there was no evidence of a current or future risk of harm to the children.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Maternal Aunt's Arrest and the Children's Detention

Mother and mother's three children lived in a residence with maternal aunt and her four children, maternal grandfather, and maternal great uncle. On October 13, 2013, Long Beach police executed an arrest warrant for maternal aunt at the property based on a narcotic sales investigation. As officers approached the property, they observed maternal aunt drop a red makeup bag as she walked toward the residence. Officers knocked on the front door and announced their presence, but when they received no response, they forced entry and detained mother, the children, maternal great uncle, maternal grandfather, and mother's adult son. They recovered the bag maternal aunt dropped and found methamphetamine and concentrated cannabis inside. Maternal aunt told them a motor home in the back of the property belonged to her and she slept in it because the house was too crowded. Officers searched it and found a functioning digital scale with white residue on it, bags containing methamphetamine, and a .22-caliber rifle with ammunition. There were also three surveillance cameras in and around the trailer

2

that sent live feeds inside the trailer. Officers recovered maternal aunt's cell phone, which contained narcotics-related text messages. Maternal aunt was arrested.

After determining N.K. and D.K. were at risk, officers contacted DCFS and a social worker responded to the scene. A detective told the social worker maternal aunt was a long-time user and seller of narcotics and she was well-known to other drug users in Long Beach. In his opinion, there was no way anyone residing on the street was unaware of maternal aunt's narcotic sales because the traffic in and out of the residence was constant.

Maternal grandfather told the social worker maternal aunt was "in her own world," living out in her trailer and doing "her own thing." She had people "in and out all of the time," but when he tried to put a stop to it, maternal aunt would just scream at him. He was sure maternal aunt was using drugs, but he was not sure what kinds. Based on the look of the people coming onto the property, he imagined they were there for "something bad."

With regard to mother and father, maternal grandfather said father was a prison "lifer" who was in and out of jail all the time and who was currently incarcerated. When father lived in the home, maternal grandfather and father would get into fights all the time, including one incident in which maternal grandfather got so angry he hit father with a pool cue and father "went after" maternal grandfather with a bat, breaking maternal grandfather's finger. Maternal grandfather had a restraining order against father and was nervous because father was getting out soon. Neither mother nor maternal aunt worked and the family's only income was maternal grandfather's social security and his wife's income, which created difficulties for him and put his house in jeopardy. He said mother had a history of methamphetamine use, but he believed she was clean now.

Mother said she lived in the home with her three children: N.K., D.K., and her adult son Jayson.[1] After she and father divorced a few years prior, she moved into the

---

[1] Mother had two other children: an adult daughter who did not live in the home and a son who was born with Down's syndrome and died as an infant.

home with her children because she could not afford a place to live on her own. When she moved in, maternal aunt began staying out in the trailer because the house was too crowded. As a result, maternal aunt would be "inside all of the time with her kids, but sleeps in the trailer most of the time." Mother and maternal aunt did not have a good relationship and did not speak much. Mother knew maternal aunt was "up to no good by the people she has over" and mother reported maternal aunt "uses speed probably daily" for "at least a few years."

Mother admitted she smoked marijuana daily due to an injury to her foot and once had a medical marijuana card, but she had not renewed it.[2] She also admitted she had a criminal record from 15 years ago, which was the result of burglarizing someone during the time when she was using "speed." She served time in prison, where N.K. was born. Since then, she had not used drugs and she reported no other arrests or convictions. (This was not accurate, as outlined below.) She disclosed her adult son Jayson was on probation for domestic violence against his girlfriend and resisting arrest. And she reported a history with the DCFS, but no case had been opened and the children had never been removed.

DCFS determined the children needed to be taken into custody because there was no suitable caregiver available and because "the narcotics found in the home and throughout the property place the children at imminent and exigent risk to their immediate safety."

At the police station, the social worker interviewed the children. D.K. said he, his mother, and his brothers moved into their grandparents' home after father went to prison and mother could not afford their apartment. He said mother smokes marijuana to calm down and because she has "skin cancer," although he did not know how much or how

---

[2]    On this point, the detention report states verbatim, "[*Maternal aunt*] reported that she smokes marijuana daily due to an injury on her foot. She stated that she had a medical marijuana card, but has not renewed it." (Italics added.) In context, we believe the reference to maternal aunt was a typographical error and was intended to refer to mother.

often she did so.  He was unaware if mother used any other drugs.  When father was around, "there was a lot of fighting all the time" and father would "threaten everyone and make life miserable."  With father gone, there was "not that much fighting in the house."  He knew father used methamphetamine, but he was not sure if he was currently using it.  According to D.K., father was arrested because he had drugs and a gun on him and he ran from and lied to the police.  D.K. also said maternal grandfather and maternal uncle smoked marijuana in the home.

D.K. explained that once they moved into the home, maternal aunt bought the motor home because she thought the house was "too tight."  He was sure she used drugs and said she was a "hoarder" who collected "weird things."  Once he was in the home's garage and found a "fanny pack" with a "bunch of syringes" inside, which he believed belonged to maternal aunt's friend.  He said maternal aunt had people over in the back of the house "all the time" and her friends were "not good people."  One friend asked him if he wanted the friend to "jack" a skateboard for him.  D.K. said he did not want people like that around his house.

N.K. said his father had always been in and out of prison and he was currently incarcerated for threatening the family and domestic violence.  He knew mother used to have a medical marijuana card but did not anymore.  He was unaware of any drug use in the house.  He did not like to talk to maternal aunt and rarely saw her.  He constantly saw people walking into the backyard to see maternal aunt, but "everything happens back there and he does not really pay attention to it."

Both children denied any physical punishment or violence.

## 2.  *Criminal and Referral Histories*

DCFS found 11 referrals for the family dating back to 1998, none of which resulted in dependency proceedings.  The only substantiated referral was a March 2008 report of sexual abuse of mother's now-adult daughter by maternal great uncle.  There were no allegations of abuse of mother's other children, and after an investigation, the allegations were substantiated for the daughter but any risk to the other children was deemed unfounded.

5

Mother's criminal history included 1994 and 1997 convictions for burglary; a 2004 felony conviction for possession of a controlled substance and drug paraphernalia; and a 2010 misdemeanor conviction for prostitution. Maternal grandfather had prior convictions for possession of a controlled substance and mother's adult son had a conviction for domestic violence and obstructing an officer. Maternal aunt had theft and possession of controlled substances convictions.

Father had a lengthy criminal history between 1991 and 2011, including convictions for burglary; vandalism; giving false information to officers; possessing, selling, or manufacturing dangerous weapons; assault with a deadly weapon; possession of controlled substances; domestic violence; and taking a vehicle without the owner's consent. Most recently he was incarcerated for stalking and making criminal threats in 2010, and for violating a domestic violence court order in 2011. He was released on January 20, 2014, while this dependency proceeding was pending.

### 3. *Dependency Petitions*

DCFS removed the children from mother's custody and filed a juvenile dependency petition alleging multiple grounds for jurisdiction, including that mother and maternal aunt engaged in "violent, physical altercations" in the presence of the children during which they pulled each other's hair (a-1, b-5); mother had a history of abuse of methamphetamine and currently abused marijuana (b-2); mother allowed the children to reside in a home in which maternal grandfather, maternal aunt, and maternal uncle used illicit drugs around them (b-3); mother failed to protect the children following the sexual abuse of her daughter (b-4, d-1, j-1); and mother allowed the children to live with her adult son when he engaged in violent physical altercations with a female companion in the children's presence (b-6). With regard to maternal aunt's arrest, the petition alleged as follows (b-1): "The children N[.]K[.] and D[.]K[.']s mother . . . placed the children in a detrimental and endangering situation, in that on 10/30/2013, methamphetamine, marijuana, a rifle and ammunition, was [*sic*] found in the children's home within access of the children. Such a detrimental and endangering situation established for the children

6

by the mother, endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm, damage and danger."

DCFS thereafter filed an amended petition adding two allegations related to father:

B-7: "The children N[.]K[.] and D[.]K[.']s father . . . has a long history of substance abuse including but not limited to the use of methamphetamines. The father has a long criminal record and is a repeat offender who has multiple arrests and convictions for Felony: possession of controlled substance. The father's extended criminal record; the father['s] use of drugs; possessions of drugs and/or paraphernalia and involvement in a drug related life-style renders the father unable to provide regular care for the children. The father's substance abuse history endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm, damage and danger."

B-8: "On prior occasions, children N[.]K[.] and D[.]K[.']s mother . . . and the children's father . . . have engaged in violent, physical altercations, in the presence of the children. Prior instances of domestic violence between the mother and father have been reported to law enforcement[.] [T]he father has served jail or prison time for said offenses. The father . . . has been convicted for Inflict[ing] Corporal Injury to Spouse, Stalking and has been convicted of violating a Court Order to Prevent Domestic Violence (restraining order). Such behaviors and violent activity between the mother and father . . . endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of physical harm, damage and danger."

*4. Jurisdiction/Disposition Report*

In the jurisdiction/disposition report, N.K. said he did not know much about what was going on with maternal aunt before the police arrived at the home. He heard drugs and guns were found in the trailer but there were no guns or drugs found in the home and he did not know maternal aunt was using drugs. D.K. said he was never around maternal aunt, so he did not know much about her except she associates with "bad people." She never let him inside the trailer on the property and he never wanted to go inside. At best, he had been at the trailer to ask her a question, but that was as far as he went. Maternal

7

aunt once showed him a BB gun but he had never seen a real gun and never saw a gun in the home.

Mother admitted she "did" marijuana a month prior to her interview but she had completely stopped. She said the last time she used "speed" was four years ago and had been through drug treatment for her past drug issues. She tested negative for any current drug use and had enrolled in substance abuse and parenting counseling. She denied maternal grandfather and maternal great uncle used drugs. She also denied the allegations related to maternal aunt's arrest. She said nothing was found in the home where she and her children lived and the drugs and guns were found in maternal aunt's trailer in the driveway. She knew maternal aunt was "up to no good" but she was not aware of exactly what she was doing. She and her children were never near the trailer where maternal aunt lived, and maternal aunt would only come in the home to use the bathroom. She said maternal aunt was taken to jail and had not been back to the property. The trailer was no longer there and no "bad people" or "druggies" came around anymore. She had not had any contact with maternal aunt and did not know her whereabouts.

After filing the amended petition, DCFS interviewed father on April 7, 2014. He had been released from prison four months earlier on January 20, 2014, and was on parole. Father's parole agent reported he and father were meeting regularly and he had not experienced any problems with father. Father's special conditions for parole included drug testing and attending anger management classes. Father's drug tests had been negative.

Father reported that, at the time of the interview, he had been married to mother for 14 years and been in a relationship with her for 22 years. They were not currently in a relationship but they were "working on their relationship" and working to have the children returned home. He admitted a drug history that included experimental use of LSD and other drugs and his drug of choice was methamphetamine, but his last use was in 2010. He also admitted his criminal history, including his most recent conviction for criminal threats against mother's male companion, for which he was most recently

8

incarcerated. While in prison he had been diagnosed with bipolar disorder and posttraumatic stress disorder and was currently taking antidepressant medication. After his release, he enrolled in a six-month outpatient treatment program that focused on drug and alcohol education, relapse prevention, and anger management, and included domestic violence counseling and instruction on parenting, self-esteem, and life skills. He attended group sessions three times a week and showed "interest in making necessary changes in his life style and to become a better person."

Regarding the petition allegations, father denied mother used any drugs other than marijuana. As for maternal aunt, he said the drugs and gun were found in the trailer and mother "would not allow that stuff around the children[;] I know that for sure, never." He denied anyone knew what maternal aunt was doing. He also denied anyone else in the family other than maternal aunt used drugs. He confirmed maternal aunt and her trailer were gone from the property.

5. *Jurisdiction/Disposition Hearing*

At the April 10, 2014 jurisdiction/disposition hearing, mother (joined by father and the children) moved to dismiss all the allegations in the petition. The court granted the motion for all counts except b-1.[3] As relevant here, for count b-7 the court found that, "regardless of the reason why [father] hasn't been using, there is no evidence that he has been using and just because he's out [of prison] he may use again, that is speculative." The court reached the same conclusion for count b-8 regarding the alleged domestic violence. The court specifically rejected DCFS's arguments the children were at risk because father had been incarcerated for violating the domestic violence court order, he had not enrolled in drug or domestic violence programs while in prison, and mother may have been considering reconciling with him.

---

[3]     The minute order states the juvenile court sustained counts b-3 and b-6, but both parties agree the reporter's transcript accurately reflects all counts but b-1 were dismissed.

9

Moving to the jurisdictional portion of the hearing, the court sustained count b-1, reasoning:  "It is kind of nebulous and I can't compose it now, but mother -- if mother has just exercised poor judgment in all sorts of ways in what was going on in the household, the main one that presents the risk is b one.  And at the time of this hearing, even though it's been a while, mother's judgment is still in question throughout the history of this famil[y] and I think this is still -- there is enough evidence to show that right now mother exercised poor judgment, was -- knew or should have known what was going on and has not properly addressed that lapse in judgment and diligence."

The court declared the children dependents and placed them in mother's home with the following conditions:  father may not live in the home and must comply with his terms of parole; no one may smoke marijuana in the presence of the children; mother must have six clean drug tests or be subject to a complete drug program; maternal aunt may not be present on the property; and DCFS would make unannounced home visits. The court also ordered conjoint counseling, family maintenance services, and monitored visits for father in a public setting, for which mother could not serve as monitor.  Mother timely appealed.  DCFS timely cross-appealed.

## DISCUSSION

### 1.  *Mother's Appeal*

Mother contends insufficient evidence supported the juvenile court's exercise of jurisdiction based on count b-1 related to maternal aunt's drug activity.  We agree. """"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.]  We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.]"  [Citation.]  """"The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.""""""  (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124 (*John M.*).)  "Substantial evidence, however, is not synonymous with any evidence.  [Citation.]  'A decision supported by a mere scintilla of evidence need not be affirmed on appeal.'  [Citation.]  Although substantial evidence

10

may consist of inferences, those inferences must be products of logic and reason and must be based on the evidence. Inferences that are the result of mere speculation or conjecture cannot support a finding. The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record." (*In re James R.* (2009) 176 Cal.App.4th 129, 135 (*James R.*).)

"Under section 300, subdivision (b), the juvenile court may assert jurisdiction over a child when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness.' Thus, '[t]he three elements for jurisdiction under section 300, subdivision (b) are: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'"'" (*John M., supra*, 212 Cal.App.4th at p. 1124.) A jurisdictional finding must be supported by a preponderance of the evidence. (Welf. & Inst. Code, § 355.)

Here, there were no allegations or evidence the children actually "suffered . . . serious physical harm or illness" from mother's actions related to maternal aunt's drug activity, so the juvenile court could only exercise jurisdiction based on evidence that mother's actions created "a substantial risk that the child[ren] *will* suffer" serious physical harm or illness. (§ 300, subd. (b), italics added.) The focus at the jurisdictional hearing is on current conditions and whether they create a substantial risk the children will suffer serious physical harm. "Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*James R., supra*, 176 Cal.App.4th at pp. 135-136; see *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.)

11

We have no doubt mother demonstrated a lapse in judgment by living with her children in a home that was in close proximity to a trailer from which maternal aunt was selling drugs. Mother and the children observed people constantly entering and leaving the property. One of maternal aunt's friends asked D.K. if he wanted him to "jack" a skateboard and D.K. found a bag of syringes in the garage on the property. Further, maternal aunt did not appear to reside exclusively in the trailer and she had free access to come in and out of the home where the children were living.[4] Although mother claimed she was unaware of what exactly maternal aunt was doing, the juvenile court was entitled to disbelieve her in light of the other evidence in the record, such as the detective's comment there was no way anyone residing on the street was unaware of maternal aunt's narcotic sales based on the constant traffic in and out of the residence.[5]

But there was no evidence mother's prior lapse in judgment in allowing the children to live near maternal aunt's drug activity would recur to create a current or future risk to the children. By the time of the jurisdiction/disposition hearing six months after maternal aunt's arrest, maternal aunt was no longer on the property and the trailer had been removed, there were no "bad people" or "druggies" coming around the property, mother did not know maternal aunt's whereabouts, and there was no evidence to suggest maternal aunt would return to the property anytime soon. Even when maternal aunt was on the property, the children avoided her and the trailer and there was no evidence they witnessed any actual drug sales. Nor was there any evidence mother or father's own drug histories might contribute to any current or future risk. The undisputed evidence demonstrated mother last used methamphetamine four years prior to the

---

**4** Mother claims the trailer was "locked," but there was no evidence to support that contention. The police report indicates officers had to "force[] entry" into the trailer, but that does not compel the inference it was locked.

**5** We reject DCFS's argument that the children were put at risk because maternal aunt dropped the drug-filled makeup bag on the property when she saw the police. Given that happened while police were at the scene, there was no chance the children would have gotten access to the bag or the drugs inside.

12

jurisdiction/disposition report and father last used methamphetamine in 2010. Both continued to test negative for drugs and both had enrolled in substance abuse counseling.

DCFS argues there was a current risk because mother should have known what maternal aunt was doing based on her own observations of people on the property and her own experience with methamphetamine. We agree mother should have been highly suspicious of maternal aunt's activities, but the fact remains that no evidence suggested mother would (or indeed, could) make the same mistake again, given maternal aunt and the trailer were gone from the property. DCFS also argues there was "no reason to believe [maternal aunt] would not return to the home and resume her[] illegal activity once released from custody." But DCFS bore the burden in the juvenile court to prove she would return to the property and thereby expose the children to a current or future risk of harm. (See *In re A.S.* (2011) 202 Cal.App.4th 237, 244.) Absent that evidence, any such risk is purely speculative. There was simply no evidence of any current or future risk of harm to the children based on mother's prior lapse in judgment in raising her children near where maternal aunt was selling drugs.

Because we conclude the jurisdictional findings must be reversed, the dispositional orders must also be reversed. (*James R., supra*, 176 Cal.App.4th at p. 137.)[6]

### 2. *DCFS's Cross-appeal*

DCFS cross-appeals the juvenile court's dismissal of the allegations in count b-7 regarding father's substance abuse and related criminal history and in count b-8 regarding past domestic violence between the parents. "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial

---

[6]     As a result of our holding, the parties' respective arguments regarding the court's dispositional orders are moot.

13

determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)[7]

The evidence of father's history of substance abuse, related criminal convictions, and prior domestic violence was not so compelling as to leave no room for the trial court to find the children did not face a current or future risk of physical harm. (*I.W., supra*, 180 Cal.App.4th at p. 1529 ["This is simply not a case where undisputed facts lead to only one conclusion."].) In dismissing the allegations, the juvenile court was most concerned by the lack of current activity creating a risk to the children, which was amply reflected in the record. There was no evidence father engaged in any criminal, drug, or domestic violence activity since 2011. While true he was incarcerated until January 2014, he remained out of trouble during the four months between his release and the jurisdiction/disposition hearing. During that time he was on parole, which included conditions for drug testing (all of which were negative) and anger management classes. He met regularly with his parole officer, who reported no problems. He was also enrolled in an outpatient treatment program on drug and alcohol education, relapse prevention, anger management, and domestic violence, during which he showed "interest in making necessary changes in his life style and to become a better person." He was not living in the home. While we recognize there is always a risk father might relapse and mother might again demonstrate a lapse in judgment, the record did not compel the juvenile court to conclude there was a current risk to the children.[8]

---

[7] There is some disagreement in the case law as to whether this is the applicable standard when the appeal challenges the failure of proof in the juvenile court. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967 [recognizing the standard set forth in *I.W.* and noting "courts in this situation have still employed the test of whether there is substantial evidence that supports the determination of the trier of fact"].) Because DCFS has cited *I.W.* as the proper standard, we will assume it applies.

[8] We reject DCFS's argument that father was unable to protect the children due to his incarceration because that was never alleged as a ground for jurisdiction, nor was he incarcerated at the time of the jurisdiction/disposition hearing.

## DISPOSITION

The jurisdictional and dispositional orders are reversed.  The dismissal of counts b-7 and b-8 is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

_____

[*] BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

15