[No. H034242. Sixth Dist. Jan. 6, 2010.]

In re J.N. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v.
E.N. et al., Defendants and Appellants.

## Counsel

Sheri Cohen, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Roland Simoncini, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Miguel Marquez, Acting County Counsel, and Harrison Taylor, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**ELIA, J.**—In this case, the juvenile court found three siblings came within its dependency jurisdiction under Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1] In its disposition, the court adjudged the minors dependent children of the court, ordered them returned home to the care and custody of mother (E.N.) on a case plan of family maintenance services, and removed them from the physical custody of the Father (L.B.)[2] on a case plan of family reunification services.[3] Each parent appeals. (§ 395, subd. (a)(1).)

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] On May 8, 2009, the court determined that L.B. was the presumed father of J.N.

[3] The court's written order following the jurisdiction/disposition hearing, prepared by the Santa Clara County Counsel's Office, states that the court found clear and convincing evidence that the children's welfare required physical custody to be taken from father and there were no reasonable means of protecting minors' physical health without removing them from father's physical custody. "A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature. Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody. (Welf. & Inst. Code, § 361, subd. (c); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307].)" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525 [14 Cal.Rptr.3d 496], fn. omitted.) Under section 361, subdivision (c)(1), the juvenile court must, "as a reasonable means to protect the minor," consider "the option of removing an offending

Both father and mother seek review of the finding of jurisdiction and assert a claim of insufficiency of the evidence to establish that the children are persons described by section 300, subdivision (b). The mother additionally argues that the juvenile court improperly considered the benefits of assuming jurisdiction in assessing the risk to the children. The father maintains that there was no credible evidence that either parent had an unresolved substance abuse problem and joins in mother's arguments. Appellants do not challenge the disposition.

We reverse.

I

*Factual and Procedural History*

On March 10, 2009, the Santa Clara County Department of Family and Children's Services (DFCS) filed juvenile dependency petitions on behalf of appellants' three children, eight-year-old J.N., four-year-old Ax.B., and 14-month-old As.B. Each petition alleged that the particular child came within the juvenile court's jurisdiction because the child had suffered, or was at substantial risk of suffering, serious physical harm "as a result of the failure or inability of his or her parent or legal guardian to supervise or protect the child adequately" and "by the inability of the parent or legal guardian to provide regular care for the child due to the parent's or legal guardian's mental illness, developmental disability, or substance abuse." (See § 300, subd. (b).) They also alleged that "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child" (§ 300, subd. (g)).

The petition stated four factual allegations to show each child came within section 300, subdivision (b). Allegation b-1 stated that mother and father had been arrested for child endangerment, they were currently incarcerated, and, on March 8, 2009, police had placed the children in custody as a result of caretaker absence. Allegation b-2 recited that, on March 8, 2009, father was involved in an automobile accident, with the three children in the car, while he was driving under the influence of alcohol. It further stated that As.B. was not securely fastened in her car seat when the vehicle crashed into a city light pole and As.B. and J.N. received injuries requiring medical attention. Allegation b-3 stated that both parents were intoxicated at the time of the accident

parent or guardian from the home" and "allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." At the time of the hearing, the father was incarcerated and minors were placed with mother. The issue of whether there existed reasonable means of protecting the children short of removing them from father's physical custody is not raised on appeal.

and the children were not properly fastened in their seats. In addition, it alleged that the parents made hostile threats to others and resisted arrest while police conducted the investigation and criminal charges were pending with regard to the incident. Allegation b-4 alleged that "both parents have a substance abuse problem that negatively impacts their ability to parent the children."

On April 6, 2009, the DFCS requested that the jurisdiction hearing be continued to allow further assessment by the social worker because the mother had been released from custody. The deputy district attorney representing the children encouraged mother to visit the children now that she was out of custody because they missed their parents "quite a lot." The proceedings were continued until April 13, 2009.

On April 13, 2009, counsel for mother requested that the matter be set on the early resolution conference calendar and the children be released to the mother pending the next court date and neither the deputy county counsel representing the DFCS nor the deputy district attorney representing the children had any objection. The court ordered that the "DFCS has the authority to release the children to mother's care pending the next hearing." It set the matter for an early resolution conference on April 20, 2009. The matter did not resolve on April 20, 2009, and the court scheduled the contested jurisdiction hearing for May 8, 2009.

At the contested jurisdiction and disposition hearing on May 8, 2009, mother and father submitted the matter for decision based upon documentary evidence and argument. The court received, without objection, the following documents into evidence: the DFCS's April 6, 2009 jurisdiction/disposition report; the DFCS's April 13, 2009 addendum report; a packet of discovery documents dated May 5, 2009, which included DFCS's contact log and the April 8, 2009 treatment status report regarding mother; the May 4, 2009 Family Legal Advocates report and assessment prepared on behalf of mother by social worker Emily Zavala; documents verifying father's participation in various programs while incarcerated;[4] and a minute order resolving the criminal case pending against mother.

The evidence showed the following. When police officers arrived on the scene, they saw that a minivan had collided with a signal light pole. A witness had seen father get out of the driver's seat immediately after the vehicle struck the light pole. The witness saw father go around to the

[4] These documents included two documents verifying father's continuing participation in a substance abuse prevention program, a document confirming his enrollment in an ESL (English as a second language) program, and an AA/NA (Alcoholics Anonymous/Narcotics Anonymous) meeting attendance sheet showing father had attended two meetings.

passenger side of the van and begin to pull children out and heard mother tell father in Spanish to "get out of here, just go." Father, carrying one of the children, then began to walk away through the corner gas station's parking lot until a person who had been pumping gas took the child away from father.

J.N. told one of the responding officers, who observed that J.N. had small scratches to his right forearm and right stomach area, that his father struck another vehicle, the other driver approached their vehicle and broke its side window by aggressively swinging its door. J.N. explained that his father then drove away from the scene, the other vehicle followed, and his father lost control of their vehicle and struck the street signal. J.N.'s younger sister, who was not wearing a safety restraint, flew under a seat, head first. J.N. pulled his sister out from under the seat and left the vehicle.

The police reports indicated that father ignored the advice of an officer to have a seat until the ambulance arrived. He continued to walk around the scene yelling at witnesses. He exhibited objective symptoms of being under the influence of alcohol, specifically bloodshot watery eyes, slurred speech, unsteady gait, and an odor of alcohol coming from his breath and around his person.

Father told an officer that he had consumed about six beers. Father could not perform any of the field sobriety exercises due to his high level of intoxication. He did not follow directions for performing a PAS (preliminary alcohol screening) breath test. Blood test results showed he had a 0.20 percent blood-alcohol concentration.

Father did not know the date and gave an officer false information about the vehicle collisions. He claimed that an unknown male had taken the van while his family was inside and he had jumped into the driver's seat and fought this person. Father did not have a driver's license. Father was handcuffed to prevent him from resisting arrest and he became very agitated and uncooperative during the police investigation.

One of the responding officers saw that a small child was bleeding profusely from her head and advised mother to put pressure on the wound until the ambulance arrived. Mother ignored the officer's advice and began yelling at another female as the child continued bleeding in her arms. Mother exhibited symptoms of being under the influence of alcohol, specifically slurred speech, unsteady gait, and a strong odor of alcohol. She refused to hand the child to the officer when the officer asked her to do so. After the ambulance arrived, the officer tried to ask mother what happened, but she walked away from him and continued yelling at another female. She did not

stop as the officer instructed and, when he grabbed her right arm, she pulled away from him. She was taken into custody. Her blood-alcohol level was 0.11 percent.

On March 9, 2009, a social worker who met with the children at Valley Medical Center reported that the two older children's "concern for their parents was most evident." The youngest child received nine stitches for a laceration to her head. J.N., who sustained abrasions to his right elbow and hip and bruises to his neck as a result of the accident, and Ax.B., who was not injured during the accident, were admitted to the children's shelter. As.B. was admitted to the children's shelter after being discharged by the hospital later that day.

That same day, the mother explained to a social worker that the family had gone out to a local restaurant for dinner and she and her husband had "a few beers." She acknowledged that "she was a little drunk and her husband may be drunk." She denied that father abused alcohol. She reported that both the younger children had been securely fastened in their car seats before their vehicle had left the restaurant's parking lot. According to mother, father had crashed their vehicle into another vehicle, he had driven away in fear, he had failed to stop when mother told him to stop, and he had driven fast and crashed into a light pole. She explained that she "freaked out" when police arrested her. Mother stated that father is a good father and is supportive.

On March 9, 2009, J.N. told the social worker visiting the children at the shelter that the family had gone out to dinner and stayed at the restaurant for two hours. He stated that "his parents looked red and sleepy after they left a restaurant." J.N. explained that his father drove away after his father crashed into another vehicle, the other driver yelled and threw things at their car, which caused a window to break, and a piece of glass hit J.N.'s right elbow. J.N. stated that he became scared and he took As.B. out of her car seat and placed her next to him to protect her. J.N. said that his father drove fast and refused to stop when his mother yelled at him to stop, the vehicle crashed into a light pole, and As.B. fell beneath the seat and may have hit her head. As.B. was bleeding and J.N. had an abrasion to his neck.

According to J.N., his mother drank a beer once in a while and his father did not drink much at home, only one or two beers a couple times per month. J.N. did not see his parents fighting and they were "good to him and his siblings."

On March 12, 2009, mother told a social worker, who spoke with her in jail, that she had made a "bad decision to drink" the night of the accident and it would not happen again. She could not remember how much beer she

drank that night but acknowledged that she had been drinking beer like she was drinking soda. She had suggested that father call his brother to drive them home but father had not wanted to call because he did not want to bother his brother that late and they were not too far from home.[5] Mother had been tired and she had acquiesced. She recalled fastening the two younger children in their car seats and reported that the oldest always put on his own seatbelt. The other driver involved in the crash had been upset and had thrown something causing their car window glass to break. The father had panicked and crashed into a light pole. She insisted that father "does not abuse alcohol and he will not drink again after what happened to their family." She stated that she and father had learned "a hard lesson" and father "felt guilty and sorry for what happened." Mother was "tearful and . . . missed her children a lot." She recognized the separation was hard on her children and worried about them being away from home.

By March 13, the doctor at the children's shelter's clinic reported that both J.N. and Ax.B. were healthy children. The marks from J.N.'s injuries had disappeared.

When contacted in jail on March 17, 2009, father appeared cooperative and remorseful. He admitted that, on the night of the accident, mother and he had about nine beers during dinner at a restaurant. He reported that he "hardly drinks 1–2 beers every month." He remembered thinking about not driving but deciding it was "easier just to drive home." He recalled that he put Ax.B. in his car seat and mother put As.B. in her car seat before they left the restaurant. Father recognized that he had made "a bad decision to drive," which he regrets, and he "is thankful his children are safe."

On March 26, 2009, J.N. told the social worker, who was visiting the children at their foster placement, that he missed his mother and asked the social worker to deliver a letter to his mother. The foster mother reported that Ax.B. was missing his mother a lot. As.B.'s head wound was healing but still open.

On April 1, 2009, the mother told the social worker that she missed her children a lot and asked how they were doing. She consented to a recommended surgery for As.B. to reduce future scarring and infection. Mother asked the social worker to "let her children know she is doing okay and will see them soon." When contacted that same day, J.N. asked the social worker whether his letter to his mom had been delivered. After hearing that the letter had been delivered and "his mother sent her love to him and his siblings," J.N. smiled and said he could not wait to see her.

[5] The deputy district attorney representing the children at the jurisdiction/disposition hearing told the court that the family's address was within walking distance of the restaurant.

Mother pleaded no contest to two misdemeanors, a violation of Penal Code section 273a, subdivision (b) (child endangerment), and a violation of Penal Code section 148, subdivision (a)(1) (resisting, delaying or obstructing an officer). The court placed her on formal probation, ordered her to complete a certified child abuse/parenting program and a substance abuse program, and ordered her release. She was released on April 2, 2009.

The next day, during a supervised visit between mother and the children, the three children were happy to see their mother. "The mother was appropriate and showed her affection and love to her children. It appeared that the children and their mother have good attachment." "The children cried when they left their mother."

The April 6, 2009 jurisdiction/disposition report, which was signed March 27, 2009, reported no prior child protective service referrals regarding the family.[6] The report recognized that the parents love their children, work hard to provide a better life for their children in this country, and feel remorseful for what happened to their children and grateful that they are safe. It reported that the children are healthy, well adjusted, well behaved and bonded with each other, and developing normally. It stated that the children miss their parents and often ask about them.

The jurisdiction/disposition report states that mother regretted drinking over her limit and not stopping father from driving under the influence with the children in the car and gave reassurances that it would not happen again and her children's safety would come first. The report indicated that criminal charges arising from the incident were pending against father.[7] It reported that father was remorseful and he was "able to recognize that drinking and driving is dangerous and against the law." Both parents were cooperative and willing to change.

The report recommended that the petitions be sustained. With regard to the children's safety in the home, the jurisdiction/disposition report stated that both parents need to address their drinking issues that led to the automobile accident and placed the children's health and safety at risk. It concluded that father placed his children's safety at risk by driving under the influence, which was "inexcusable," and he could have avoided the accident by

[6] The report indicated that mother and father had been in the United States about a year and a half and they had been previously living together in Mexico.

[7] The report stated that the charges included a DUI (driving under the influence; Veh. Code, § 23153, subd. (b)), child endangerment (Pen. Code, § 273a), hit and run resulting in injury (Veh. Code, § 20001, subd. (a)), hit and run resulting in property damage (Veh. Code, § 20002, subd. (a)), driving without a valid driver's license (Veh. Code, § 12500, subd. (a)), and resisting or obstructing an officer (Pen. Code, § 148).

choosing not to drive. The report acknowledged that mother was not responsible for father's behavior but indicated that she could have acted more responsibly by finding another way for the family to get home. As to disposition, the report recommended and requested a continuance to allow further assessment of mother's circumstances.

The treatment status report (TSR), dated April 8, 2009, regarding mother indicated that she had reported that she only occasionally drinks at home and this incident involved her drinking three beers at a restaurant. She had denied any substance abuse problem or anything other than bad judgment. In the evaluator's view, mother had seemed to minimize alcohol use, both her and her husband's, and the ramifications of alcohol use.

The DFCS's April 13, 2009 addendum report, signed April 9, 2009, continued to recommend that the petitions be sustained. It stated that mother had visited her children, completed a substance abuse assessment, and obtained housing and other necessities for their return. The children had been happy to see their mother and could not wait to go home. The social worker determined that "the children [were] safe to return home and the family will do well with Family Maintenance Services with the mother." It reported that "[t]he children have a good relationship with their parents and want to return home." It further stated that "[i]f the father engages in services upon his release as quickly as the mother, the Social Worker will at that time recommend Family Maintenance for him as well."

Another supervised visit occurred between mother and children on April 11, 2009.

On April 14, 2009, following the children's return to their mother's care, the social worker visited the family home. The children appeared physically healthy and well cared for by their mother and they were happy to be home with her.

The May 4, 2009 report and assessment prepared by a social worker on mother's behalf recommended that the dependency case be closed. The social worker concluded the evidence did not show that mother had a substance abuse problem since there was only the one incident and no other involvement with either the dependency system or the criminal justice system. The children appeared healthy, well cared for and nurtured by their mother and it was apparent that she loves them deeply. Her conclusion was that there was no need of oversight by the dependency court since mother was on probation supervision based on the criminal charges.

At the outset of the May 8, 2009 hearing, the court indicated its tentative decision was to proceed with informal probation because there was no history

of child welfare issues or criminal history. Counsel for the DFCS indicated that an informal supervision agreement proposal was ready.[8]

After argument, the petition was amended to conform to proof. Allegation b-1 was amended to reflect that only father was currently incarcerated. The phrase "appear to" was added to the final sentence in allegation b-4 so that it read: "Further, both parents *appear to* have a substance abuse problem that negatively impacts their ability to parent the children." (Italics added.)

The court indicated it was deciding whether it should take jurisdiction or proceed with informal supervision. It stated that "[t]he whole issue is about future risk" and "[f]uture risk . . . is formed by the severity of the past risk and the frequency of the past risk . . . ." Although it recognized that there was no pattern of past risk, the court found the one incident was significant. The court commented upon the severity of the single incident, the extent of father's alcohol consumption and his poor judgment, and the mother's failure to protect. The court stated with regard to father that it was "a concern that someone would drink that much and could drink that much." It noted that the criminal case against father was still pending and its disposition was an "unknown factor." The court commented, "If it was really about mom, I would definitely say informal supervision would be sufficient." It concluded: "I think all of those pieces come together with enough indication that there is some future risk that at least the Court should have that oversight. And I agree we should set it for 90 days for interim to look at dismissal. By that time we'll have more information about father, we'll have more to show about all the good things that he's spending his time on while incarcerated."

The court found that the allegations of the petitions were true as amended and children came within the description of section 300, subdivision (b). The deputy county counsel asked for the petition's allegations regarding section 300, subdivision (g), to be stricken and the court found that basis for jurisdiction did not apply.

## II

## *Discussion*

Section 300, subdivision (b), provides in pertinent part: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her

[8] "[N]othing in [section 300] is intended to limit the offering of voluntary services to those families in need of assistance but who do not come within the descriptions of this section." (§ 300, subd. (j).)

parent or guardian to adequately supervise or protect the child . . . , or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."

"The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134 [106 Cal.Rptr.2d 465].) "Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300" at the jurisdiction hearing. (§ 355, subd. (a).) "On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.]" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433 [95 Cal.Rptr.3d 235].)

Thus, "we must uphold the court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378 [4 Cal.Rptr.2d 198].) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185 [68 Cal.Rptr.3d 465].)

In this case, the question is whether evidence of a single episode of parental conduct was sufficient to bring the three children within the juvenile court's jurisdiction. As reflected by the amendments to conform to proof, the juvenile court impliedly found that the original allegation that the parents have a substance abuse problem had not been proved, only something lesser ("appear to have"). The court did *not* find, and nothing in the record supported a finding, that either parent had an ongoing substance abuse problem, and any such conclusion would be conjecture based upon the record before us. Consequently, the evidence did not establish that any of the children were at risk of physical harm as a result of parental inability to provide regular care due to the parent's substance abuse. (See § 300, subd. (b).)

With regard to whether the evidence showed that each child had suffered, or was at substantial risk for suffering, serious physical harm or illness, as a result of the failure or inability of a parent to adequately supervise or protect the child, the evidence showed that the parents' actions with regard to the drinking and driving incident had placed all their children at substantial risk of serious physical harm and was a cause of serious physical harm to As.B.

Nevertheless, the evidence indicated that both As.B. and Ax.B. had been fastened into their car seats at the outset but that J.N. had removed As.B. from her car seat to protect her after the initial collision. Ax.B., who remained in his car seat, was not injured.

Even though the evidence is sufficient to establish that As.B. "suffered . . . serious physical harm . . . as a result of the failure . . . of his or her parent . . . to adequately supervise or protect" her (§ 300, subd. (b)), the consensus of the courts, at least until recently, has been that a court cannot exercise dependency jurisdiction under this subdivision where the evidence shows a lack of current risk. (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [2 Cal.Rptr.2d 429]; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1397 [32 Cal.Rptr.3d 526] ["the purpose of section 300, subdivision (b) is to protect the child from a substantial risk of *future* serious physical harm and that risk is determined as of the time of the jurisdictional hearing"]; see also *In re Carlos T.* (2009) 174 Cal.App.4th 795, 803 [94 Cal.Rptr.3d 635] [finding of current risk is required for jurisdiction under § 300, subd. (b)], but see *In re J.K., supra,* 174 Cal.App.4th at p. 1435, fn. 5 [initial exercise of jurisdiction may be based upon either a prior incident of harm or risk of harm].)

■ In *In re Rocco M., supra,* 1 Cal.App.4th at page 824, the court stated: "Thus the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' [Citations.]" Another court explained that subdivision (b) of section 300 "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M., supra,* 131 Cal.App.4th at p. 1396.)

We do not agree with the recent case of *In re J.K., supra,* 174 Cal.App.4th 1426, to the extent it concludes that section 300, subdivision (b), authorizes dependency jurisdiction based upon a single incident resulting in physical harm absent current risk. (Cf. *In re J.K., supra,* 174 Cal.App.4th at p. 1435 [§ 300, subd. (b), is satisfied by showing that minor suffered prior serious physical harm; a showing of prior harm sufficient, standing alone, to establish dependency jurisdiction].) If such an interpretation governed such a case, a juvenile court could take jurisdiction but would be required to immediately terminate the dependency under the final sentence of section 300, subdivision (b).

■ "[O]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]" (*People v. Murphy* (2001) 25

Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) The modern version of section 300 was enacted in 1987 (Stats. 1987, ch. 1485, § 4, pp. 5603–5606, operative Jan. 1, 1989) and has been amended many times. ■ Section 300, subdivision (b), has always contained the final sentence limiting dependency to those cases where it is "necessary to protect" the child "from risk of suffering serious physical harm or illness." Until recently, section 300, subdivision (b), has been judicially construed to require a showing of current risk. (See, e.g., *In re Rocco M., supra,* 1 Cal.App.4th at p. 824; *In re Nicholas B., supra,* 88 Cal.App.4th at p. 1134; *In re Savannah M., supra,* 131 Cal.App.4th at pp. 1395–1396; *In re David M.* (2005) 134 Cal.App.4th 822, 829 [36 Cal.Rptr.3d 411].) " 'There is a strong presumption that when the Legislature reenacts a statute which has been judicially construed it adopts the construction placed on the statute by the courts.' [Citation.]" (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134], fn. omitted; see *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115] ["It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction."].)

Further, section 300.2 states: "Notwithstanding any other provision of law, the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are *currently* being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are *at risk of that harm.*" (Italics added.) This statement of purpose is consistent with the final sentence in section 300, subdivision (b), which limits dependency jurisdiction to situations requiring protection from current risk of "serious physical harm or illness."

■ The interpretation of section 300, subdivision (b), endorsed by *In re J.K.* would elevate form over substance and lead to absurd results where the evidence indicates an absence of current risk. " ' "It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' [Citations.]" (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014]; see Civ. Code, § 3528 [stating maxim of jurisprudence that "[t]he law respects form less than substance"].) "[T]he rule against interpretations that make some parts of a statute surplusage is only a guide and will not be applied if it would defeat legislative intent or produce an absurd result. [Citation.]" (*In re J. W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363].)

Accepting that the juvenile court could not properly exercise jurisdiction over any of the children under section 300, subdivision (b), if the evidence showed they were not at current risk of serious physical harm, and mindful that the juvenile court could not properly assume jurisdiction over J.N. and Ax.B. pursuant to section 300, subdivision (b), unless there was an adequate showing that they were at "substantial risk" of suffering "serious physical harm or illness" as a result of parental failure or inability "to adequately supervise or protect," we now turn to the record before us. While past harmful conduct is relevant to the current risk of future physical harm to a child (see *In re David M., supra,* 134 Cal.App.4th at p. 831 ["past abuse or neglect can certainly be an indicator of future risk of harm"]; *In re Rocco M., supra,* 1 Cal.App.4th at p. 824 ["evidence of past conduct may be probative of current conditions"]), the evidence as a whole must be considered. "[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. ([*In re Rocco M., supra,* 1 Cal.App.4th at p. 824]; *In re Steve W.* [(1990)] 217 Cal.App.3d [10,] 22 [265 Cal.Rptr. 650].)" (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565 [135 Cal.Rptr.2d 72] [§ 300, subd. (j)]; see *In re James R.* (2009) 176 Cal.App.4th 129, 135–136 [97 Cal.Rptr.3d 310] [§ 300, subd. (b)]; *In re Savannah M., supra,* 131 Cal.App.4th at p. 1394 [§ 300, subd. (b)].)

In this case, the court mentioned a number of factors that it considered probative in determining whether there continued to be a substantial risk of serious physical harm to the children. The court viewed the severity of the drinking and driving incident as most significant, emphasizing the father's level of alcohol consumption and his poor judgment and also taking into consideration the mother's failure to protect. We can certainly agree that the facts of this incident were egregious. The California Supreme Court has long recognized "the horrific risk posed by those who drink and drive." (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732]; see Health & Saf. Code, § 11760 [California Legislature has recognized that problems of inappropriate use of alcoholic beverages include "[s]ubstantial fatalities, permanent disability, and property damage resulting from driving under the influence"].) There were serious lapses in the judgment of both parents, who drank alcohol to excess while their three young children were in their care and then, despite their pronounced alcohol impairment, proceeded to have father attempt to drive the family home. The parents' excessive alcohol use appears to have also affected their judgment and behavior in responding to the ensuing accident and police investigation.

In evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current

understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances.

Despite the profound seriousness of the parents' endangering conduct on the one occasion in this case, there was no evidence from which to infer there is a substantial risk such behavior will recur. The Legislature has recognized that "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) But here the court did not find that the parents were substance abusers. In addition, its lesser finding that they "appear to" have a substance abuse problem was not based on substantial evidence. There was no evidence, such as expert opinion, from which to reasonably infer that persons who drank as did the parents, exhibited their symptoms and behavior, and had their blood-alcohol level on a single occasion were likely to have an ongoing substance abuse problem. The evidence as a whole did not even establish that mother or father consumed alcohol on a regular basis. (Cf. *In re James R., supra*, 176 Cal.App.4th at p. 137 ["Although there was some evidence [mother] drank beer, the record does not show she was regularly intoxicated, rendering her incapable of providing regular care for the minors or posing a risk to them. The mere possibility of alcohol abuse, coupled with the absence of causation, is insufficient to support a finding the minors are at risk of harm within the meaning of section 300, subdivision (b)."].)

Further, there was no evidence, and there were no factual allegations, that either parent's parenting skills, general judgment, or understanding of the risks of inappropriate alcohol use is so materially deficient that the parent is unable "to adequately supervise or protect" the children. The evidence consistently indicated that the children were healthy, well adjusted, well cared for, bonded with each other, and developing appropriately. While it is a valid concern that the TSR evaluator in this case thought mother seemed to minimize her and her husband's alcohol use and the ramifications of alcohol use, by the time of the jurisdiction/disposition hearing, the criminal court had ordered mother to complete substance abuse and parenting programs and placed her under probation supervision. Significantly, both parents were remorseful, loving, and indicated that they were willing to learn from their mistakes. Although father was still incarcerated at the time of the hearing, mother was available to provide care.

The evidence was not sufficient to establish that the children were at substantial risk of serious physical injury as the result of parental inability to adequately supervise or protect the children. The evidence did not support a finding that each child was within the jurisdiction of the juvenile court under section 300, subdivision (b).

## III

### *Disposition*

The judgment of the dependency court is reversed.

Rushing, P. J., and Duffy, J., concurred.