Filed 9/20/16  In re C.R. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.R., a Person Coming Under the Juvenile Court Law. | B267817 |
| | (Los Angeles County Super. Ct. No. DK12023) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| T.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Law Office of Lisa A. Raneri and Lisa A. Raneri for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

T.R. (Mother) repeatedly failed one afternoon to keep her two-year-old daughter, C.R., from wandering toward a busy public street. When social workers from the Department of Children and Family Services (DCFS) interviewed Mother after the incident, she denied there was a problem with her child being "too close to the curb" and made odd statements about satellites and about superpowers in the form of FBI agents. We consider whether there is sufficient evidence to support the trial court's finding that C.R. was at risk of serious harm under Welfare and Institutions Code section 300, subdivision (b)(1) based on her mother's failure to protect her.[1]

## I. BACKGROUND

In April 2015, Mother and two-year-old C.R. travelled from Louisiana to California and arrived with no money. Mother sought out and obtained temporary crisis housing assistance from LA Family Housing, a homelessness and poverty assistance organization (LA Housing). After approximately one month in crisis housing, Mother and C.R. moved to a motel using vouchers obtained from the Los Angeles Department of Public Social Services.

The motel where Mother and C.R. were staying, The Village Inn, was located on Lankershim Boulevard in North Hollywood. The door to their room opened immediately onto an alleyway, with a driveway a short distance away to the right (when facing out of the room) that opened onto Lankershim Boulevard. An LA Housing staff member visited Mother and her daughter at the motel on June 15, 2015, and after the visit, DCFS received a referral from LA Housing alleging general neglect of C.R. by Mother.

According to the referral, when the LA Housing staff member arrived at the motel room, Mother was smoking a cigarette and C.R. was lying on the bed drinking a soda. When Mother opened the door and spoke to the staff member, two-year-old C.R. wandered out of the room toward nearby Lankershim Boulevard. Mother did not make

_____

[1] Undesignated statutory references that follow are to the Welfare and Institutions Code.

2

an effort to go get the child; instead she remained in the doorway and yelled at C.R. to get her to come back to the room, which she did. This happened three additional times while the LA Housing staff member was present: the child would wander toward the street and Mother would stay where she was but yell at C.R. to come back.

After receiving the child welfare referral, DCFS sent a social worker to speak to Mother at the motel. The assigned social worker observed no marks or bruises on C.R., and the child appeared neat and clean. When the social worker informed Mother of concerns C.R. had been seen wandering from the room near the street, Mother denied the child had been near the street and further denied that anyone had even been to her room and spoken to her. The social worker reported Mother became defensive during the conversation and refused to provide her phone number or sign any DCFS paperwork. She agreed, however, to take the social worker's business card and acknowledged the social worker did not want to lose contact with her.

On the same day the social worker visited Mother at the motel and Mother learned LA Housing made a referral to DCFS, Mother threatened LA Housing staff and had to be escorted off the organization's premises. Two days after that, Mother checked out of the motel room with C.R., without notifying either LA Housing or DCFS.

Unaware of Mother and C.R.'s whereabouts, DCFS filed a section 300 petition and sought a protective custody warrant for the child. The sole count of the petition, brought under section 300, subdivision (b), alleged there was a substantial risk C.R. would suffer serious physical harm or illness as a result of Mother's failure to adequately supervise or protect C.R. Specifically, the petition alleged Mother "placed the two year old [C.R.] in a detrimental and endangering situation by failing to provide the child with adequate adult supervision, resulting in the child repeatedly [wandering] out of the room where mother and child were residing near a busy public street." A "detention at large" report filed concurrently with the petition revealed Mother previously surrendered her 14-year-old son temporarily to Child Protective Services in Louisiana in connection with allegations of "neglect, dependency, and physical abuse-threatened harm/danger." The

3

juvenile court issued a protective custody warrant for C.R. as requested, as well as a warrant for Mother's arrest.

DCFS thereafter learned Mother had been living at a Salvation Army shelter, after a series of referrals, since checking out of The Village Inn. Mother's case manager at the shelter reported she was unaware DCFS had been trying to locate Mother, and Mother herself expressed surprise that warrants had been issued. Mother and her daughter appeared in juvenile court once their whereabouts were known, and the court recalled the outstanding warrants. The court ordered C.R. detained but directed DCFS to confer with Mother to determine whether there was a safety plan on which they could agree that would allow C.R. to be released back into Mother's custody.

During conversations with Mother that followed, DCFS discussed the incident at the motel that led to the filing of the section 300 petition. Mother acknowledged, in her words, that "DCFS took my daughter away because someone said she was too close to the curb." Mother, however, was incredulous that this resulted in an order removing C.R. from her custody, stating that nothing had happened with "the curb incident" and that DCFS was traumatizing C.R.

In a later team meeting with DCFS personnel, DCFS became concerned about what it characterized as bizarre statements made by Mother. As reported by DCFS, Mother said she had satellites over her head that record her and her interactions with the DCFS. Mother also stated there were "two superpowers" in Louisiana, who Mother believed to be FBI agents, that had assisted her in resolving the child protective proceedings in that state and that had instructed her to leave Louisiana and get some rest—which is what prompted her relocation to California.[2] A Department investigator later asked Mother if she was willing to undergo a psychological examination to rule out any mental health issues. She refused and denied having any psychological problems.

---

[2] In an earlier phone call, Mother also told a social worker that President Obama would be calling to discuss Mother's case with Department personnel.

On the day of the scheduled jurisdiction and disposition hearing, September 23, 2015, DCFS filed a first amended petition to add a second count to the previously filed petition. This second count, also alleged under section 300, subdivision (b), stated Mother had demonstrated "numerous mental and emotional[ ] problems" on "numerous occasions," and that "[s]uch mental and emotional condition on the part of the child's mother endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage." Counsel for Mother declined the court's offer to continue the matter in light of the filing of the amended petition, and the parties accordingly proceeded to evidence and argument.

The juvenile court received into evidence DCFS reports prepared in advance of the hearing (including photographs of the motel that depicted the proximity of Mother's motel room to the street), a letter offered by Mother that documented the date she arrived at the Salvation Army shelter, and stipulated testimony from Mother on four points that are not critical to our resolution of this appeal. Mother's attorney argued there was no basis for jurisdiction because Mother's supervision of C.R. at the motel had been "effective and appropriate": Mother could see C.R. from the doorway, and C.R. returned when Mother called to her rather than stepping out into the street. Mother's attorney additionally argued, "[a]t best, this may have been some sort of one-time incident," noting the Salvation Army shelter case manager had not seen Mother mistreat C.R. or leave her without adult supervision. C.R.'s lawyer concurred with Mother's position and asked the court to return the child to Mother's custody even if it decided not to dismiss the amended petition. The attorney appearing for DCFS argued the petition should be sustained as pled. He explained that children at the age of two need constant supervision and that Mother's decision to allow C.R. to wander near a street in a downtown area demonstrated a risk of harm sufficient to confer jurisdiction over the child. Counsel argued DCFS did not have a lot of faith in Mother's ability to supervise the child, at least absent a psychological evaluation.

The court sustained the first count of the petition alleging a failure to protect in connection with the lack of adequate supervision that led to C.R. wandering toward the

street; the court dismissed as unsupported by the evidence the second count alleging Mother's mental problems endangered C.R. The court addressed Mother as follows in making its ruling: "[I]'ve got to ask myself and answer myself [honestly]: does this little girl sound to be at risk with you? And I have to say yes to that. [¶] I know you say you are cooperative, but it doesn't sound from the reports that you were as cooperative as I would have expected. If I had full cooperation, I wouldn't be worried about taking jurisdiction. But we had the child detained at large. We had issues with you not keeping in touch with [DCFS]. [¶] I have to agree with county counsel, two-year-olds need constant attention. Four times the child wanders into or very near the street is a danger. And that is neglect in my mind."

When making its jurisdictional finding on the record, the juvenile court first stated: "I will find the (b)(1) count true from the first amended petition, but I don't find sufficient facts to support the (b)(2) count. [¶] The child will be declared a person described by WIC 300." The court found C.R. could be safe with Mother if reasonable services were put in place and accordingly ordered DCFS to release C.R. to Mother in seven days and confer with Mother within 48 hours to connect her with appropriate mental health assessment and treatment services. Later in the hearing, the court stated: "We'll declare the child a person described by WIC 300 (a) through (j). We will order an HOP [home of parent] Mother." The minute order prepared for the hearing states the court declared C.R. a dependent child "under WIC subdivision[ ] B."

## II. DISCUSSION

Mother challenges the juvenile court's orders on two grounds, but neither is persuasive. She argues insufficient evidence supports the jurisdictional findings, but we see substantial supporting evidence in the record, namely, the reports and photos detailing the incident at the motel where C.R. repeatedly wandered "too close to the curb" (as Mother recounted the charge), plus Mother's subsequent statements indicating she failed to grasp the gravity of the risk. Mother also argues the juvenile court found C.R. a dependent under each and every subdivision of section 300 even though there was no

6

evidence that would support such a broad finding. This reading of the record fails to understand the court's comments in context; properly understood, the juvenile court asserted jurisdiction only under the subdivision actually pled, subdivision (b)—just as the court's minute order indicates.

### A. Standard of Review: Substantial Evidence

We review the juvenile court's jurisdictional findings and orders to determine whether they are supported by substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; see also *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [appellate court reviews the whole record to determine whether it discloses substantial evidence, that is, evidence that is reasonable, credible, and of solid value].) Mother, as the party challenging the juvenile court's orders, bears the burden to show there is no evidence of a sufficiently substantial nature. (*In re D.C.* (2015) 243 Cal.App.4th 41, 52.) When undertaking our review, we draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings. (*Id.* at pp. 51-52.)

### B. Substantial Evidence Supports the Juvenile Court's Jurisdiction Finding

As our summary of the factual and procedural background demonstrates, there is substantial evidence C.R. "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).) Adequate supervision of a two-year-old child walking out of a motel room into an alleyway and close to Lankershim Boulevard—not once but four times—requires more than faith the child will come back when called instead of continuing or even accidentally stumbling out into the street. It is undisputed, however, that Mother chose to remain in the doorway to her motel room notwithstanding the child's age and penchant

7

for wandering alone toward the street. The trial court was entitled to find the circumstances established by the evidence amounted to a failure by Mother to protect her daughter from a substantial risk of serious harm. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216 ["court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"]; *In re N.M.* (2011) 197 Cal.App.4th 159, 165 [same]; see also *In re Mia Z.* (2016) 246 Cal.App.4th 883, 891-892 [recognizing a three-year-old child who walks approximately 120 feet away from home unattended is "expos[ed] . . . to dangers of all kinds"].)

Mother advances three unavailing arguments to the contrary. She contends (1) there was no evidence establishing how close C.R. was to Lankershim Boulevard, and thus no evidence she was at risk of any harm; (2) the court could not base jurisdiction on what was an isolated incident without evidence of a continuing or future risk of harm to C.R.; and (3) the court asserted jurisdiction over C.R. not on a proper statutory basis but rather because it believed Mother had been uncooperative with DCFS.

As to Mother's first contention, the photos and DCFS reports in evidence establish the requisite risk of harm. We have reviewed the photos depicting Mother's motel room, and the distance between her door and Lankershim Boulevard appears short. Moreover, the motel room door opens immediately onto an alley and a nearby driveway off Lankershim, which is itself dangerous for a two-year-old like C.R. even if she did not make it within inches of the street; a car coming down the boulevard could turn into the driveway and strike C.R. In addition, Mother's interview statements, particularly her description of others complaining her child was "too close to the curb," tend to show C.R. had wandered significantly away from the motel room and closer to the street; if C.R. had instead remained relatively close to the room or further up the alley, it would make little sense to refer to the street curb, even when recounting accusations made by others. Perhaps most important in our analysis, however, is the applicable standard of review. We must draw all reasonable inferences from the evidence to support the juvenile court's findings (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1216), and the photos and

8

DCFS reports in the record certainly support the reasonable inference that C.R. was close enough to Lankershim Boulevard to be at substantial risk of serious harm.

Next, Mother relies on *In re J.N.* (2010) 181 Cal.App.4th 1010 (*J.N.*) to argue proof of an ongoing risk of harm to C.R. at the time of the jurisdiction hearing was both necessary and lacking. In that case, the father of three children who was driving under the influence of alcohol crashed into a light pole with his wife (also intoxicated) and children in the car. (*Id.* at p. 1014.) The *J.N.* court followed precedent holding jurisdiction under section 300, subdivision (b) will not lie where all that is at issue is a single past incident resulting in physical harm; instead, there must be "some reason to believe" there is a "current" or future risk to a child. (*Id.* at p. 1023.) The *J.N.* court also identified factors courts should consider when evaluating whether such an ongoing risk of serious harm exists, including the nature of the past conduct and "the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, . . . participation in educational programs, or other steps taken[ ] by the parent to address the problematic conduct in the interim . . . ." (*Id.* at pp. 1025-1026.)

Evaluating these considerations, the *J.N.* court believed that "[d]espite the profound seriousness of the parents' endangering conduct on the one occasion in this case, there was no evidence from which to infer there is a substantial risk [their] behavior will recur." (*J.N.*, *supra*, 181 Cal.App.4th at p. 1026.) The court pointed to the absence of evidence that the parents' parenting skills and general judgment were "so materially deficient that [they are] unable 'to adequately supervise or protect' the children" and emphasized "both parents were remorseful, loving, and . . . willing to learn from their mistakes." (*Ibid.*)

We assume for purposes of our analysis that *J.N.* is correct in holding a continuing or future risk to a child, rather than only a past incident of parental neglect, is necessary to trigger jurisdiction. (Contra, e.g., *In re Adam* (2010) 183 Cal.App.4th 1250, 1261 ["proof of current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b)"]; *In re J.K.* (2009) 174

9

Cal.App.4th 1426, 1435 (*J.K.*); see also *In re Ethan C*. (2012) 54 Cal.4th 610, 636 [acknowledging the holding in *J.N.* is contrary to suggestions in *J.K.*].) But even proceeding on this assumption, *J.N.* hurts rather than helps Mother's case. Unlike the parents in *J.N.*, Mother was not remorseful—she appeared oblivious to the risk to C.R.'s safety in letting her wander off, and she expressed no willingness to learn from the incident and supervise her more closely in the future. (Cf. *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134-1135, 1137 [no jurisdiction under section 300, subdivision (b) where mother admitted and regretted a solitary incident of physical abuse].) True, the Salvation Army shelter personnel did not see Mother mistreat C.R. or leave her unattended while present in the shelter for three months, but during this same time, Mother was also resistant to DCFS's attempts to work with her to ensure C.R.'s safety. Moreover, and again unlike the parents in *J.N.*, Mother's odd comments about satellites, superpowers, and President Obama in conversations with DCFS did call into question her "general judgment" (*J.N.*, *supra*, 181 Cal.App.4th at p. 1026) and future ability to adequately supervise or protect C.R. Thus, the present circumstances and the nature of Mother's past conduct sufficiently established a then-current risk to C.R.

Last, we reject Mother's argument that the juvenile court's statement about her cooperation with DCFS (*ante* at p. 6 ["If I had full cooperation, I wouldn't be worried about taking jurisdiction"]) demonstrates error. The court's consideration of Mother's lack of cooperation with DCFS was not a substitute for a proper jurisdictional finding under the terms of section 300, but rather an observation—consistent with prior cases, including the *J.N.* case Mother cites—that Mother's circumstances and mindset tended to indicate C.R. was still at substantial risk of harm, and that Mother needed mental health and parenting services to help eliminate that risk.[3] (*J.K.*, *supra*, 174 Cal.App.4th at p.

---

[3] This is also a case in which DCFS initially considered resolving the matter via a voluntary services agreement under section 301, but withdrew the offer to resolve the case in that manner after Mother's odd statements during DCFS interviews and her general lack of cooperation. The statement by the juvenile court that Mother highlights can also be understood in that context, namely, a statement that had Mother been more

1439 [considering, when evaluating current and future risk to minor, the father's failure to take any steps to address his behavior that led to abuse, including the fact that he had not appeared to make "any genuine effort to cooperate with the DCFS to address the issues"].)

> C. *The Juvenile Court's Declaration of the Basis for Jurisdiction Does Not Warrant Reversal*

We also reject Mother's argument that we must reverse so the court can restate on the record its jurisdictional finding so as not to leave any impression it extended beyond subdivision (b) of section 300. Mother's focus on a single statement by the court during the jurisdiction and disposition hearing fails to understand the statement in the context of the full record.

Considered in full, the record establishes the court took jurisdiction over C.R. solely under section 300, subdivision (b). It is, of course, undisputed that the first amended petition was pled under only that subdivision, and none of the DCFS reports admitted in evidence suggested jurisdiction would be proper under any other statutory provision. In addition, when first stating its ruling after hearing argument from the parties, the juvenile court referred to the statutory section without specifying a subdivision—likely, and reasonably, believing the specific subdivision at issue, the only one pled, was understood by the parties.[4] To be sure, later during the hearing the court did say "[w]e'll declare the child a person described by WIC 300 (a) through (j)" when making other orders regarding disposition. We understand this statement, albeit not as precise as it could have been, as the equivalent of the court's first statement, i.e., as a statement C.R. was a person described in section 300 generally, not as a statement that it found jurisdiction under specific subdivisions that had not been pled and that no one had

---

cooperative, DCFS would have proceeded with a section 301 disposition such that the court would not have been called upon to decide jurisdiction.

[4] The court stated: "The child will be declared a person described by WIC 300."

11

argued. Our reading is confirmed by the minute order issued in connection with the hearing, which states in two places that the court found jurisdiction only under section 300, subdivision (b).[5]

DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

TURNER, P.J.

KRIEGLER, J.

---

[5]     Even if Mother's interpretation of the juvenile court's statement during the hearing were correct, she would not be entitled to reversal because she has shown no prejudicial error. (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [*People v. Watson* (1956) 46 Cal.2d 818 standard of harmless error applies in dependency proceedings].) A reviewing court may affirm a juvenile court's finding of jurisdiction if any one of the statutory bases that are enumerated in a petition is supported by substantial evidence. (See, e.g., *In re I.J.*, *supra*, 56 Cal.4th at p. 773.)