Filed 9/17/25 In re J.R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B338774 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 24CCJP00580A |
| Plaintiff and Respondent, | |
| v. | |
| L.E., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge. Affirmed.

Owen P. Martikan, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

_____

A father appeals the juvenile court's assertion of jurisdiction over his son. We affirm. Undesignated statutory citations are to the Welfare and Institutions Code.

I

Six-year-old J.R. told his mother his father had hit him two days earlier, while he was at his father's on an overnight stay. The mother saw marks, swelling, and redness on J.R.'s face.

J.R. told his mother that his father slapped him because J.R. did not know an answer to a question. J.R.'s teacher saw redness on his face that same day.

After J.R. said his father slapped him, the mother called the father to ask what happened. The father replied, "What did he tell you?"

The mother took J.R. to the doctor. An emergency doctor wrote J.R. had "three large patches of redness on the left cheek" and "small red dots on the jaw line." The injury was consistent with a slap to the face.

J.R. told the doctor his father slapped him with an open hand, and that his father had slapped him like that before. J.R. could not recall a specific timeframe.

Over the next two days, J.R.'s face became more swollen, which the mother documented with photographs.

About a week after the incident, a police officer interviewed J.R. The officer did not see any swelling on J.R.'s face, but did see discoloration on his cheek. J.R. told the officer that his father

2

slapped him on the left cheek for not being able to answer a question his father asked.  It happened around bedtime in the father's bedroom, and J.R. cried after his father hit him.  The father then apologized and went to sleep.

J.R. demonstrated the slap.  He told the officer his father had slapped him before, but not as hard as this time.  J.R. said his father slapped him on the buttocks for not cleaning his room.  J.R. understood the difference between a disciplinary slap on the buttocks and being slapped on the face for not answering a question.  J.R. had some difficulty providing accurate past timeframes.

About two weeks after the incident, a social worker visited the mother's home.  J.R. told the social worker his father slapped him on the face with an open hand because he did not know the answer to a question.  That was the only strike.  His father seemed upset.

The paternal grandmother and great grandfather were in the home during the slap but did not witness it.  J.R. said his father repeated the question after slapping him but did not hit him again.  J.R. did not remember what the question was.  After the slap, his father apologized and told him it was an accident.  J.R. said the slap made him feel "sad," and added that "it hurted [sic] super bad."

J.R. reported he is not afraid of his father and denied experiencing pain in his cheek now that it was two weeks later.  When asked about the first time his father slapped him, J.R. stated it happened "a long time ago."  An undisclosed party also told the Department J.R. had said his father had slapped his face with an open hand before as well.  When the social workers asked

3

when the past incidents happened, J.R. could not be specific "due to his age development."

J.R. denied abuse by his mother. J.R. also denied witnessing domestic violence in either household and stated that he has not observed any fighting between his parents.

J.R. stated, "I do not like that dad slaps me." When asked if there was anything he would change about the father, J.R. replied, "Just telling him to stop doing the bad things." When the social worker asked about the bad things the father did, J.R. replied, "No. I forget." J.R. then denied there was anything he wished he could change about the father.

When the social worker interviewed the mother several months later and asked about prior incidents of the father putting his hands on J.R., she replied there had been instances, but it was "not in a malicious way." Rather the father and J.R. liked to "tussle" and "wrestle." The mother also noted J.R. "has a hard time explaining things" and believed J.R. was likely referring to the same incident being investigated when speaking about prior instances. She added that J.R. cannot tell time.

The mother and father have a history of domestic violence. The mother reported that, after they had been together for five years, the father slammed her head on the ground. The mother did not recall where then three-year-old J.R. was, but they all shared a room so she was "sure he was around the room." The father's brother did not see what happened, but was concerned by what he heard and called the police. Police arrested the father in connection with this incident, and he suffered a misdemeanor conviction. The court sentenced the father to 16 days in jail and three years' probation and ordered him to complete a 52-week

4

domestic violence program.  The mother obtained a restraining order, which had since expired.

The mother and father separated after this incident, though they continued to live together to co-parent J.R.  Three years later, after an argument about the mother dating someone else, she and J.R. moved in with the maternal grandmother.

The mother told the social worker the father slashed her tires shortly before the slapping incident.  The mother later denied this statement and instead alleged that "air was let out" of her tires.  A tire shop employee said "the tires appeared to have been slashed."

The mother stated "everything" seemed to be a trigger for the father's anger, including how his parents treated him and her reminding him of tasks or responsibilities.  The mother described the father as someone who "acts on his emotions."  J.R.'s maternal grandmother reported "every time he breaks up with her and kicks her out, he slashes her tires."  Mother claims the maternal grandmother exaggerated.

The mother denied any personal history of substance abuse, physical abuse, sexual abuse, or mental health illness.  She disciplines J.R. by speaking with him about his behavior.

After the father slapped J.R., the mother completed an online application for a restraining order.  Since then, the father had contacted the mother only about her new boyfriend.  The father did not ask why J.R. had not returned to his home.

About a month and a half after the incident, the mother told the social worker she had not filed a family law order due to being busy with work.  She further reported that she has allowed J.R. to have visits with his father.  However, the visits were

5

supervised, and she ensured the father was not left alone with J.R.

The mother asked the social worker whether her statements regarding the father's domestic violence against the mother could be omitted from the report. The mother requested that the report include only her responses related to the slapping incident. The social worker advised the mother that the Department must report all relevant information to the court and would not edit it. The Department reported to the court that the mother had moved back in with the father, and it was unclear what their current relationship was.

The father eventually appeared for an interview after refusing to cooperate for two months. When asked about the incident, the father said J.R. was crying in his sleep, and so the father "smacked him on his face" as a form of discipline. The father said both he and J.R. "bruise easily," particularly because J.R. is "light-skinned." He expressed that the child's teacher and hospital "made [the injury] more than it was." He admitted to apologizing to J.R. after the slap because J.R. appeared "shocked" and looked sad.

A social worker asked the father what he learned from the court-ordered domestic violence, parenting, and counseling classes he had taken in connection with his earlier misdemeanor conviction. The father stated that he believed spanking children on the buttocks was an acceptable form of discipline until around the age of twelve, at which point he considered it ineffective. The father viewed spanking as "normal" and something he would do "whenever [J.R.] is misbehaving and I need to discipline him." The father stated that he has smacked J.R. on the butt, back of the head, and arm. When pressed for more information about

what he learned from his parenting class, the father stated, "Man, I guess I gotta go back" to the class because he "forgot." He explained that when he took the class his focus was on the "relationship aspect" of it. The father also reported that he and the mother were attempting to "work it out," and that the mother had been staying in the home with him and J.R.

Two months after the incident, J.R. reported there had not been any further incidents of physical abuse by his father. J.R. was no longer staying at his father's home overnight, and confirmed he had a monitored visit with his father. The social worker saw no marks or bruises on J.R.

The Department filed a section 300 petition on behalf of J.R., alleging he was at substantial risk of serious physical harm as a result of the father physically abusing the child.

At the jurisdiction hearing, the father's counsel argued jurisdiction was improper because the Department had "only pled this as a one time incident." The juvenile court rejected this argument based on the evidence in the record of previous similar incidents and asserted jurisdiction. The court declared J.R. a dependent of the court and ordered the father to participate in a 26-week program of joint parenting counseling, as well as individual counseling to address "the cycle of violence, anger management and child protection." The court did not remove J.R. from either parent.

The father appealed the juvenile court's jurisdictional order.

While the appeal was pending, the juvenile court terminated jurisdiction. At our request, the parties briefed the issue of mootness.

7

## II

The father's appeal is not moot.  We can grant effective relief.  We affirm.

A case becomes moot when it becomes impossible for a court to grant effective relief, even if the court finds in favor of the plaintiff.  (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)  In dependency matters, the critical question is whether effective relief is still available.  (*Ibid*.)  This relief must have a practical, tangible impact on the parties' conduct or legal status.  (*Id* at p. 277.)

Here, that impact would be on the father's ability to challenge his potential listing on the Child Abuse Central Index (the Index).  The Department incorrectly contends the case is moot because the dependency case is over.  Even after termination of jurisdiction, a finding of physical abuse carries collateral consequences by triggering inclusion on the Index and by foreclosing access to the grievance process.

The California Supreme Court has recognized that inclusion on the Index has "practical legal consequences," and that the statutory right to a grievance hearing to challenge such inclusion is an "important protection" for affected individuals. (*D.P.*, *supra*, 14 Cal.5th at p. 279.)

Under Penal Code section 11169, subdivision (d), people are entitled to a grievance hearing related to inclusion on the Index, unless there is a court order sustaining the abuse allegation against them.  (Pen. Code § 11169, subd. (d).)  If the juvenile court's finding that the father physically abused the child is overturned, and no order remains, the father would regain the statutory right to challenge his placement on the Index through a grievance hearing.  (Pen. Code § 11169, subd. (e).)

Because that hearing offers a real opportunity for removal from the Index, our decision would directly affect the father's legal status and future prospects, particularly in employment, licensing, and custodial contexts where listings on the Index are considered.  (Health & Saf. Code, § 1522.1, subds. (a), (b).)

This would be effective relief.  The appeal is not moot.

III

On the merits, the juvenile court properly asserted jurisdiction over J.R.

The court asserted jurisdiction under subdivisions (a) and (b)(1)(A) of section 300.  Jurisdiction is proper under subdivision (a) where a child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally by a parent.  (§ 300, subd. (a).)  Where there is an isolated incident of physical abuse, to find jurisdiction under subdivision (a), there must be a pattern of conduct or a future risk of serious physical harm.  (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 139.)

Similarly, jurisdiction is proper under subsection (b)(1)(A) where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness."  (§ 300, subd. (b).)

On appeal, we apply the familiar substantial evidence standard of review to jurisdictional findings.  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  We examine the entire record, resolve all conflicts in favor of the respondent, draw all reasonable inferences to support the judgment, and uphold the findings unless no substantial evidence supports them.  (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378.)

9

Substantial evidence supports the juvenile court's finding of jurisdiction under both subdivisions (a) and (b)(1)(A).

The father slapped then six-year-old J.R. in the face for not answering a question. It left visible marks for days. That is abuse, and it is severe. The court properly asserted jurisdiction.

The court rightly reasoned that "a mere slap to the face is one thing, but a slap to leave a bruise indicates father used quite a bit of force when he did it."

The father relies on *In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 (*J.N.*), to argue that, because this was only a one-time incident, there is no continuing risk and jurisdiction is inappropriate.

*J.N.* is inapposite.

In *J.N.*, the father was involved in an automobile accident, with three children in the car, while he was driving under the influence of alcohol. (*Id.* at pp. 1014–1015.) One of the children was not securely fastened in her car seat and was hurt when the car hit a light pole. (*Ibid.*) The appellate court reversed the finding of jurisdiction because it was based on substance abuse, the father's drinking was not an ongoing problem, and the incident was a one-time accident. (*Id.* at pp. 1022–1023.)

Here, while the Department became involved with the family due to a particular incident of physical abuse, there is reason to believe the conduct might recur. J.R. told several people his father had slapped him more than once. The court was entitled to credit this statement. The youth's difficulty in providing a time frame did not bar the trial court from accepting the substance of the statement.

The trial court ruling was right.

10

## DISPOSITION

We affirm.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.

11