Filed 10/14/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re R.L., a Person Coming Under the Juvenile Court Law. | B341295 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>KIMBERLY G. et al.,<br><br>Defendants and Respondents. | (Los Angeles County Super. Ct. No. 24CCJP02487A) |

APPEAL from an order of the Superior Court of Los Angeles County.  Gabriela H. Shapiro, Commissioner.  Affirmed.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Appellant.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Respondent Kimberly G.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Respondent Omar L.

_____

## INTRODUCTION

Los Angeles County Department of Children and Family Services (DCFS) appeals from the dismissal of its petition for minor R.L. under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b).  DCFS alleged that R.L. came within the jurisdiction of the juvenile court because the then-10-month-old child was injured in a motor vehicle accident where the father was driving, the child was seated in the mother's lap rather than secured in a car seat, and both parents were under the influence of alcohol.  The juvenile court dismissed the petition, finding that DCFS failed to meet its burden of proving R.L. was at a current risk of harm based on this isolated incident of parental neglect.  We conclude the juvenile court did not err in dismissing the petition because the evidence did not compel a finding in favor of jurisdiction as a matter of law.  We accordingly affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Dependency petition

Kimberly G. (Mother) and Omar L. (Father) are the parents of R.L., a boy born in July 2023.  In May 2024, DCFS received a referral alleging that the family was involved in a motor vehicle accident in which Father was driving above the speed limit while under the influence of alcohol, and Mother was in the backseat holding R.L. in her lap with a seatbelt strapped around them, but no child safety seat.  Both Mother and R.L. were injured in the accident and taken to the hospital.  Father was arrested for driving under the influence and felony child endangerment.  At the time of the accident, Mother was 19 years old and Father was

_____

[1]    Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

21 years old.  Before this incident, neither parent had a criminal record or any child welfare history.

According to the police report, the accident occurred on May 26, 2024, shortly before 11:00 p.m.  The officers who responded to the scene observed Mother screaming on the ground, R.L. crying in an ambulance with blood on his face, and Father standing next to the driver's side of the vehicle.  The car did not have a child safety seat, and Mother admitted that R.L. was sitting on her lap when the accident occurred.  Father told the officer he was driving in the leftmost lane of the freeway at approximately 70 miles per hour when he lost control of the vehicle.  The car hit the concrete center divider, weaved to the right across all lanes of traffic, and then collided with the right shoulder wall.  The speed limit was 65 miles per hour.  The officer observed that Father had slurred speech, red watery eyes, and an odor of alcohol emanating from his breath and body.  He also appeared to have urinated on himself.  The officer administered a series of field sobriety tests, which Father failed.  The officer then placed Father under arrest.

Following the accident, Mother and R.L. were transported to the hospital.  According to the medical records for R.L., when the child arrived at the hospital, he was awake, alert, and crying but consolable.  A CT scan of his head showed that he suffered a nondisplaced fracture of the left frontal bone with a soft tissue contusion and no intracranial hemorrhage.  He also had an "intact" neurological exam.  R.L. was admitted to the hospital for further testing and discharged on May 29, 2024.  The family was provided with a car seat for R.L. at his discharge.

On June 20, 2024, DCFS interviewed Mother at her home.  As reported by Mother, she and R.L. resided in Los Angeles in

the maternal grandparents' home while Father lived in Apple Valley. After R.L. was born, Mother and the baby lived with Father for about six months, and then moved in with the maternal grandparents. The parents were separated, but were planning to get back together in the future. There was no family law order in place. On the day of the accident, Mother and R.L. went to visit Father in central California. He picked them up in his car, and they went to drink at a park around sunset. Mother stated she had "two Trulys," but denied she was drunk. She did not know how much Father drank. At some point, they decided to leave the park. Mother sat in the back of the car with R.L., and placed the seatbelt over them both. She fell asleep as Father was driving, and when she awoke, she was lying on the ground. She did not know how the accident occurred. Mother sustained a back injury in the accident, and R.L. suffered a "skull fracture," which was healing. Mother told DCFS that, at the time of the accident, R.L.'s car seat was in the maternal grandfather's vehicle, and that this was the first time that she transported the child without a car seat. She also stated, "We have car seats in both cars now."

On July 19, 2024, DCFS had a followup call with Mother, who reported that R.L was doing well. Mother had been advised by R.L.'s doctor that the fracture would heal on its own, but she should take the child to the hospital if she observed any concussion symptoms. DCFS also spoke with the maternal grandmother, who stated that Mother was "always 100% taking care of her child," and that R.L. "has an abundance of love in this home." The maternal grandmother denied that Mother shared much about the accident, stating, "She is my daughter and some[ ]things we just do not say." When asked about Father, she

4

indicated that the maternal family had minimal communication with him, but he appeared to be a good father and attentive to Mother during her pregnancy with R.L. The maternal grandmother believed that Mother and Father had an "on and off relationship."

On July 30, 2024, DCFS made a followup visit to Mother's home. The social worker observed that the home was clean, organized, and well-furnished. R.L. appeared to be developmentally on target, and comfortable in the presence of Mother and the extended maternal family. The social worker noted that the child had "multiple supports in the home who are attentive and appropriate."

On August 2, 2024, DCFS conducted a telephone interview with Father. According to Father, he resided with the paternal grandparents, and he would ask for their consent to provide their contact information to DCFS. Father declined to discuss the details of the accident due to his pending criminal case. However, he told DCFS that he "was messing up," and that he "need[ed] to stop messing up." He also stated that he had not used any alcohol or drugs since the accident, and that he would be willing to submit to a drug test and comply with anything else that DCFS wanted him to do. Father confirmed that he had no contact with R.L. since the accident, but he knew the child was doing well because Mother was a "good mom." He indicated that he wanted to see R.L., but believed he should wait until he knew what would happen with his criminal case because he did not want to make the situation worse.

On August 5, 2024, DCFS obtained an order removing R.L. from Father. When notified of the removal order, Mother stated that she would do whatever was asked to prove that R.L. was

5

safe with her.  Father indicated that he understood the reason for the removal order, and that he was happy that R.L. was able to remain in Mother's care.  Father also stated that he felt "like a horrible parent for what he did," and that he wanted to see his son again.

In its detention report, DCFS noted that both parents endangered R.L. by placing the child in a vehicle without a car seat while they were under the influence of alcohol.  However, DCFS noted that Mother was "appropriate, cooperative and forthcoming" about the incident, that she "accepts responsibility for her mistake," and that she "shows significant remorse." DCFS further noted that Mother has a "strong nurturing relationship" with R.L. and "tend[s] to all of the child's medical and basic needs," and that she "has reliable social connections as she resides with protective family members who help her with . . . the child."  In addition, DCFS stated that "[t]his is [M]other's first time being involved with the Department and [she] is willing to do anything to keep [R.L.] in [the] maternal grandparent[s'] home under her care and supervision."

On August 8, 2024, DCFS filed a dependency petition for R.L.  The petition alleged that, under section 300, subdivisions (a) and (b), Father and Mother severely neglected R.L. because both parents were under the influence of alcohol when Father drove a car at a high rate of speed while Mother held R.L. on her lap, resulting in a collision in which the child was injured (counts a-1 & b-1).  The petition further alleged that, under section 300, subdivision (b), Father was a current abuser of alcohol, which rendered him incapable of providing R.L. with regular care, and that Mother failed to protect R.L. from Father's alcohol abuse (count b-2).

At a detention hearing held on August 22, 2024, both Mother and Father appeared and were appointed counsel. The juvenile court detained R.L. from Father and released the child to Mother conditioned on her residing with the maternal grandparents. The court granted Father monitored visits with R.L., and ordered DCFS to provide both parents with referrals for services. The court also ordered that DCFS not interview Father about the car accident without his counsel present. The court set an adjudication hearing on the petition.

## 2.    Jurisdiction/disposition report

For its jurisdiction/disposition report, DCFS conducted additional interviews with the family about the petition's allegations. In a September 17, 2024 interview with DCFS, Mother indicated that she did not have a vehicle or a driver's license. Instead, the maternal grandfather provided transportation for Mother and R.L., and his vehicle had a car seat for the child. Mother believed the May 26, 2024 incident was the first time that Father drove while under the influence of alcohol. She did not believe Father had problem with alcohol, but acknowledged that she did not have a lot of contact with him after they separated. Prior to the accident, Mother and R.L. saw Father about twice a month, and they once spent the weekend with him at the paternal grandparents' home.

According to Mother, on the day of the accident, the maternal grandfather drove her and R.L. to Apple Valley and dropped them off at a mall. Father picked them up in the mid-afternoon and drove them to the paternal grandparents' house. Father did not have a car seat in his vehicle so Mother sat in the backseat with R.L. in her lap with the seatbelt strapped around both of them. After leaving the paternal grandparents' house,

they drove to a restaurant to pick up food and then went to a local park to eat. Before driving Mother and R.L. back to Los Angeles, Father stopped at a gas station where he bought two tall cans of Truly alcoholic beverages. Father opened one of the cans, and Mother took a sip, but "didn't drink a lot." Mother was not aware of Father's level of sobriety as he was driving them home because she fell asleep in the car. Although an officer claimed that Father urinated in his pants, Mother believed that a water bottle actually fell on his lap. At some point, Father lost control of the car and crashed on the freeway, but Mother could not remember the details. She recalled waking up on the side of the road and asking for R.L.. Both Mother and R.L. were admitted to the hospital, and after a few days, the child was discharged to the maternal grandmother. Mother remained in the hospital for about a week and a half and then returned home.

Mother stated that, after the accident, Father was scared about going to jail, but did not seem concerned about how she and R.L. were doing. Father had not seen Mother or R.L. since the accident, but he did ask about the child a few days later. In her interview, Mother stated: "I know it was very dumb of us in the terrible decision. We put him in danger. I take full responsibility for what happened. I know it's a mistake that I need to try to fix. I'm just happy that nothing very serious happened to [R.L.]." She added that Father "also made a mistake like [she] did and now he's paying for it. In its report, DCFS noted that Mother's claim that she only had a sip of alcohol on the night of the accident was not credible because a hospital social worker reported that Mother's blood alcohol level was 0.211 percent.

On or about September 19, 2024, DCFS contacted Father for an interview. When the social worker explained that the

8

court ordered DCFS not to interview Father about the incident without his counsel present, Father expressed that he was not aware of the order. The social worker advised Father to consult with his counsel about the matter, and limited their discussion to events preceding the accident. Father reported that Mother began residing with him during her pregnancy with R.L., and that she moved out with the child a few months after giving birth. Since then, Father only had occasional contact with R.L. Father had been arraigned on criminal charges related to the accident and was awaiting a preliminary hearing. Father was cooperative with DCFS during his interview.

DCFS also interviewed the maternal grandparents for its report. According to the maternal grandmother, she did not know Father well because he and Mother separated a few months after she gave birth to R.L. and Father did not visit the child. Mother took good care of R.L., had the support of the maternal family, and did not drink alcohol. The maternal grandmother believed that neither Mother nor Father had a problem with alcohol, and that they "didn't know what they were doing" because they were young. The maternal grandfather likewise stated that Father did not seem to have an alcohol problem, but noted that the family did not socialize much with him because Father did not live nearby or visit R.L. often. The maternal grandfather never saw Mother drink alcohol, and believed that both parents made a serious mistake. He reported that Mother was responsible in caring for R.L., and that he did not have any concerns about her ability to protect and provide for the child. He indicated that he had a valid driver's license and a car seat in his vehicle, and that he provided transportation for Mother and R.L.

The maternal grandfather further reported that he was supposed to drive Mother to a drug screening test on September 19, 2024, but he was unable to do so because he was busy at work and had to transport R.L. to a monitored visit with Father. On that day, the social worker spoke with Mother, who confirmed that she was unable to submit to her scheduled drug test due to a lack of transportation. DCFS indicated that it was in the process of arranging a makeup test for Mother. In its report, DCFS also noted that it provided Mother with a packet of referrals for individual counseling, parenting education, and substance abuse treatment. Apart from random drug testing, Mother had not enrolled in any services. Father reported that he was attending substance abuse counseling in connection with his pending criminal case, but he had not provided DCFS with the contact information for his program.

Although R.L. was too young to be interviewed, DCFS noted that the child was in good health with no signs indicating abuse or neglect. When the social worker conducted a home visit with R.L. in September 2024, the child "appeared to be in good spirits, at ease, and pleased to be in the presence of the mother and maternal grandmother." In its report, DCFS recommended that the juvenile court sustain the petition, order that R.L. remain released to Mother, and grant services to both parents.

3.    **Adjudication hearing**

On October 7, 2024, the juvenile court held an adjudication hearing on the petition. The court admitted into evidence DCFS's reports and heard argument from counsel for each party. Counsel for DCFS asked the court to sustain the petition as pled, arguing the parents' act of neglect was severe and resulted in R.L. suffering a serious head injury, Mother minimized her and

Father's conduct over the course of the proceedings, and neither parent had enrolled in a substance abuse program or other services.

Counsel for R.L. asked the court to sustain count b-1 in the petition based on the parents' neglectful conduct during the May 26, 2024 incident, and to strike the remaining counts. Counsel for R.L. asserted DCFS failed to show a current risk of harm to the child under section 300, subdivision (a), because both Mother and Father accepted responsibility for their actions and did not appear to have a history of substance abuse. Counsel for Mother and counsel for Father joined in requesting that the court dismiss the petition in its entirety. They argued the May 26, 2024 accident was a one-time incident, both parents had been cooperative with DCFS and demonstrated insight into their conduct, and neither parent suffered from a substance abuse problem.

In issuing its ruling, the juvenile court began by noting that there was no evidence that Father had a history of substance abuse, and that in any event, Father would be required to attend a substance abuse program in connection with his criminal case. The court also noted that there did not appear to be a current risk of harm to R.L. because the evidence showed that, apart from this incident, the maternal grandfather drove Mother and R.L. in a car that contained a child safety seat. The court added that, while it was no way minimizing the parents' conduct, which was "absolutely irresponsible," the child's medical records showed that he had an intact neurological exam with no intracranial bleeding, and that he was discharged relatively quickly.

The court then stated: "I don't believe that this one-time incident where all of the collaterals who were interviewed don't

11

seem to think that there is any alcohol abuse, or otherwise behavior that places the child at risk. [¶] The court doesn't believe that we need to have jurisdiction in this case in order to ensure that the father participates in [a] substance abuse [program], because he is going to have to address that in his criminal case. [¶] And the court doesn't believe that Mother's really immature and stupid decision to take two sips, which were likely a can of Truly, or if not more, while she was a passenger in the car with her baby should result in her having to do a substance abuse program. [¶] I think this was a very shocking, scary incident and I think that they are likely scared straight. [¶] And, so, over [DCFS's] objection, the court is going to dismiss this petition and not take jurisdiction, at this time."

DCFS filed a timely appeal.

## DISCUSSION

On appeal, DCFS contends the juvenile court erred in dismissing counts b-1 and b-2 in the section 300 petition filed for R.L., but does not challenge the dismissal of count a-1. DCFS claims that the evidence compelled a finding in its favor as a matter of law that Mother and Father placed R.L. at substantial risk of serious physical harm, and thus, that the child came within the jurisdiction of the juvenile court under section 300, subdivision (b). Based on the record before us, we conclude the juvenile court did not err in dismissing the petition because the evidence did not compel a finding of substantial risk of harm to R.L. at the time of the adjudication hearing.

1.   **Governing law**

Section 300, subdivision (b), provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer,

12

serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child." (*Id.*, subd. (b)(1)(A).) "The three elements of a jurisdictional finding under section 300, subdivision (b)(1) are (1) neglectful conduct by the parent; (2) causation; and (3) 'serious physical harm or illness' or a 'substantial risk' of serious physical harm or illness." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 (*Yolanda L.*).) "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm. Thus, previous acts of neglect, standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15; see also *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146; *Yolanda L.*, at p. 993.)

The child welfare agency has the burden of proving by a preponderance of the evidence that a child should be declared a dependent of the court under section 300. (*In re I.J.* (2013) 56 Cal.4th 766, 773; see § 355, subd. (a).) " '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.) "Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*), disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

13

**2. The evidence did not compel a finding of jurisdiction over R.L. as a matter of law**

At the October 7, 2024 adjudication hearing, DCFS was required to prove by a preponderance of the evidence that R.L. was a person described by section 300, subdivision (b), based on the failure of his parents to adequately supervise or protect the child. In dismissing the petition with prejudice, the juvenile court implicitly found that DCFS failed to meet its burden of proof. Accordingly, the question before this court is whether the evidence compelled a finding of jurisdiction under section 300, subdivision (b), as a matter of law. We conclude that it did not.

A jurisdictional finding under section 300, subdivision (b), generally may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur. (*Yolanda L., supra*, 7 Cal.App.5th at p. 993; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1026 (*J.N.*).) In evaluating risk to a child in such a case, "a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident." (*J.N.*, at pp. 1025–1026.)

In *J.N.*, for instance, the Court of Appeal reversed jurisdictional findings premised on a single incident of drunk driving. (*J.N., supra*, 181 Cal.App.4th at p. 1014.) The father in that case drove under the influence of alcohol with his three

14

children and intoxicated wife in the car.  (*Id*. at pp. 1014–1015.)
The father crashed into a light pole, injuring two of the children,
one of whom was not properly restrained in a child safety seat.
(*Ibid*.)  The reviewing court recognized the "profound seriousness
of the parents' endangering conduct," but concluded "there was
no evidence from which to infer there is a substantial risk such
behavior will recur." (*Id*. at p. 1026.)  The court noted "both
parents were remorseful, loving, and . . . willing to learn from
their mistakes." (*Ibid*.)  The evidence did not establish that
either parent consumed alcohol on a regular basis, or that their
"understanding of the risks of inappropriate alcohol use" was "so
materially deficient" as to render them "unable 'to adequately
supervise or protect' the children." (*Ibid*.)  Moreover, as of the
adjudication hearing, the father was incarcerated, and the
criminal court had ordered the mother to complete substance
abuse and parenting programs under supervised release. (*Ibid*.)

In contrast, in *In re M.R.* (2017) 8 Cal.App.5th 101 (*M.R.*),
the Court of Appeal affirmed a jurisdictional finding that also
arose from a drunk driving incident.  In that case, the mother
drove over 80 miles per hour while she was under the influence of
alcohol, and her two young children and intoxicated husband
were in the car.  (*Id*. at pp. 103–104.)  The children were not
properly restrained in car seats.  (*Id*. at p. 103.)  Although the
parents initially agreed to cooperate with DCFS, they later
insisted that the mother was not drunk during the incident and
that they did not need any services.  (*Id*. at pp. 104–105.)  In
concluding the evidence was sufficient to support the juvenile
court's exercise of jurisdiction, the reviewing court distinguished
*J.N.* on the basis that the parents here "continued to minimize
the seriousness of the incident . . . and had not, at the time of the

15

jurisdiction hearing, taken any significant steps to participate in educational programs concerning the problematic use of alcohol that gave rise to the substantial risk to the children's safety." (*Id*. at p. 107.) The court further noted the parents' acceptance of responsibility seemed to worsen over time, the mother had not begun an alcohol education program, and the parents engaged in a prior episode of domestic violence related to alcohol. (*Id*. at pp. 109–110.)

In this case, the record reflects that the juvenile court considered the factors discussed in both *J.N.* and *M.R.*, and concluded that the evidence failed to show that R.L. was at substantial risk of harm as of the adjudication hearing. In reaching this conclusion, the court recognized the parents' conduct on May 26, 2024, was "absolutely irresponsible," but found it was a "one-time incident" that was unlikely to reoccur. The court noted that there was no evidence that either Mother or Father had a history of alcohol abuse or engaged in "any kind of a situation like this before." The court further noted that Mother and R.L. resided with the maternal grandparents, and that the maternal grandfather was the person who primarily drove Mother and the child in a car that contained a child safety seat. The court also was persuaded that, at this stage in the proceedings, the parents "understand that what they did was irresponsible," and "they are likely scared straight." In response to DCFS's claim that the parents' failure to enroll in a substance abuse program showed they had not taken responsibility for their conduct, the court believed that Father likely would be required to attend a program as part of his criminal case, and that Mother did not need a program given the isolated nature of the incident. On this record, the evidence was not " 'of such a character and

16

weight as to leave no room for a judicial determination that it was insufficient to support a finding' " of jurisdiction. (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

None of the arguments that DCFS raises in support of its appeal compel a different conclusion. DCFS argues the juvenile court incorrectly found that Father engaged in one incident of driving under the influence on May 26, 2024, because Mother's initial statement to DCFS showed that Father was drinking and driving earlier that day. Irrespective of what time Father began drinking, the evidence supported an inference that his consumption of alcohol on that date was his only incident of driving while under the influence. DCFS also asserts the court erred when it stated that both Mother and Father were 19-year-olds engaging in underage drinking because Father was actually 21 years old on May 26, 2024. However, the record shows that the juvenile court did not base its ruling on whether the parents were legally entitled to drink on that occasion, but on whether their single episode of endangering conduct in drinking and then driving placed their child at a current risk of harm.

DCFS further contends the court engaged in a flawed legal analysis when it stated that both *J.N.* and *M.R.* were cases from the Second Appellate District and that *J.N.* was a more recent decision. As DCFS points out, *J.N.* is an older case from the Sixth Appellate District. Nevertheless, the record does not support DCFS's claim that the court erred in analyzing the factors articulated in these decisions regarding the risk of harm posed by a single incident of drunk driving. Rather, the record reflects that the juvenile court carefully considered the nature of the conduct in this case and all of the surrounding circumstances, including the parents' expressions of remorse and acceptance of

17

responsibility, the lack of any substance abuse or child welfare history, the potential programs that could be provided to Father by the criminal court, and the presence of a car seat in the vehicle that Mother primarily used for transportation. While DCFS seeks to characterize the parents' conduct as a series of separate events that endangered their son, the juvenile court found it was a "one-time incident" that did not pose a substantial risk of harm to R.L. at the time of the adjudication hearing. Our task is not "to retry the case" or to "review the record so as to recount evidence that supports [DCFS's] position . . . with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Because the evidence did not compel a finding as a matter of law that jurisdiction over R.L. was warranted, the juvenile court did not err in dismissing the petition.

## DISPOSITION

The order dismissing the section 300 petition is affirmed.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


18